NORFOLK AND WESTERN RAILWAY
COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission,
Defendants.

No. 36018.

United States District Court
N. D. Ohio, E. D.
April 1, 1965.

Edwards, Circuit Judge, dissented.

Clay Marsteller, Thomas O. Broker, Kemper A. Dobbins, Cleveland, Ohio, for Norfolk & Western Ry. Co.

Edwin Knachel, Cleveland, Ohio, Bruce Dwinell, Chicago, Ill., Joseph B. Fleming, John L. Bordes, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., John Guandolo, Washington, D. C., for Chicago, R. I. & P. R. Co. and Pullman R. Co., intervening plaintiffs.

Merle M. McCurdy, Cleveland, Ohio, for the United States and Interstate Commerce Commission.

William J. O'Brien, Jr., Chicago, Ill., John F. Dolan, Cleveland, Ohio, for Illinois Cent. R. Co. and others.

Charles B. Myers, Burchmore, Good & Bobinette, Chicago, Ill., John F. Dolan, Cleveland, Ohio, for Calumet Harbor Terminals, Inc., North Pier Terminal Co. and Seaway Stevedoring Co., Inc., intervening defendants.

Before EDWARDS, Circuit Judge, CONNELL, Chief District Judge, and KALBFLEISCH, District Judge.

PER CURIAM.

By order of November 5, 1964, the motion of Thomas O. Broker, Counsel for The New York, Chicago and St. Louis Railroad Company, to change the designation of the plaintiff to Norfolk and Western Railway Company was granted.

This litigation arises out of the national expectation that the completion of the St. Lawrence Seaway will bring a great increase in ocean-going freight to Great Lakes ports in the heartland of the continent. Chicago, the largest city on the Great Lakes, created the Chicago Regional Port District to build a new harbor to serve this traffic. The Port District prepared docks for the ships to load and unload and trackage for railroad freight cars to serve the docks. Two railroads were closest at hand; six others sought Interstate Commerce Commission permission to build trackage to connect with the Port District. This legal battle has resulted.

These complaints were filed by two railroads to seek an injunction under Title 28 U.S.C., §§ 1336, 2284, and 2321-2325, inclusive, against certain orders of the Interstate Commerce Commission which authorized six other operating railroads to extend their tracks so as to offer direct services to the newly organized Chicago Regional Port District at Lake Calumet near Chicago, Illinois.

One of the two railroads, The New York, Chicago and St. Louis (henceforth the Nickel Plate) has a line so constructed as to parallel and be prepared to serve the east side of Lake Calumet. The other complainant, the Chicago, Rock Island and Pacific Railroad Company and the Pullman Railroad Company (henceforth Rock Island) has trackage adjacent to the west side of Lake Calumet and has been providing service for such port facilities as previously existed at Lake Calumet for many years.

The six operating railroads (whose "invasion" of the Lake Calumet area is resisted by Nickel Plate and Rock Island) initiated the original proceeding before the Interstate Commerce Commission by a series of applications filed, starting in 1956. These applications sought I.C.C. approval of the construction of the necessary trackage and trackage right agreements to interconnect various of the six railroads to each other and ultimately to the Chicago Port District tracks at Lake Calumet.[1] Subsequent supplemental ap-

---

[1] "By application filed October 22, 1956, in Finance Docket No. 19538, the Kensington and Eastern Railroad Company [a nonoperating company], the Illinois Central Railroad Company, The Philadelphia, Baltimore and Washington Railroad Company [a nonoperating company], and

The Pennsylvania Railroad Company applied under section 1(18) of the act for authority to construct a line of railroad, approximately 1.431 miles, in Cook County, Ill. The initial segment of 2,900 feet, or 0.549 mile, would be constructed by the Kensington & Eastern at an estimat-

plications and amendments sought approval likewise of an agreement between the six railroads and the Chicago Port District for operations within the Port District.

Lengthy hearings were held before the I.C.C. Hearing Examiner in 1957 at which Rock Island and Nickel Plate intervened on leave granted and objected.

Estimates of tonnage anticipated to be handled through the Port subsequent to the opening of the St. Lawrence Seaway made by various witnesses for the petitioners before the Hearing Examiner ran from 30,000,000 tons per year to 58,000,000 tons per year, with grain and coal believed likely to constitute the bulk of this tonnage.

Extensive testimony was also taken from representatives of shipping and importing firms and concerns which had prospective economic relationships with the development of the proposed Port District.

We are confronted with two basic problems: (1) whether there is substantial evidence to support the decision of the Interstate Commerce Commission; and (2) the denial to the plaintiffs of due process of law.

The evidence submitted at the hearing before the I.C.C. Hearing Examiner by interveners in that proceeding who are plaintiffs in this one, bore principally upon three points: First, that the prospects of the port were not as rosy as the estimates of its proponents who testified before the Commission would have liked for the Commission to believe; second, that the two intervening railroads, plaintiffs herein, either were serving or were available to serve the port and the general area

ed cost of $222,596; the next 630 feet, or 0.119 mile, would be built by the Illinois Central at an estimated cost of $35,886; and the final 4,030 feet, or 0.763 mile, would be constructed by the Pennsylvania in behalf of the Philadelphia, Baltimore & Washington at an estimated cost of $604,094. Each applicant is to finance its proposed construction from current funds available in their respective treasuries. The track will lead out from the westbound main line of the Kensington & Eastern at a point a short distance east of Doty Avenue and then extend east and north to a connection with the proposed track of Pennsylvania on land owned by the Pennsylvania. A portion of the Pennsylvania construction would be on property leased from the Chicago Regional Port District, hereinafter referred to as the Port District. The connection between the Illinois Central and the Pennsylvania segments would be made at about 130th Street, and the Pennsylvania track, in turn, would connect with the track owned by the Port District.

"In the same application, the Illinois Central, the Pennsylvania, and the Chicago South Shore and South Bend Railroad (South Shore) seek authority under section 5(2) of the act for the acquisition of trackage rights over the line to be constructed and certain existing tracks over which it is necessary to operate in order to reach the Lake Calumet Harbor Port, hereinafter sometimes called the harbor or port. The railroad properties of the Kensington & Eastern are leased to and are operated by the South Shore. A crossover would be installed between the eastbound and westbound tracks of the Kensington & Eastern, immediately west of the connection with the track leading to the port, to enable trains coming to the harbor to cross from the eastbound to the westbound track of the Kensington & Eastern to enter the track leading to the port.

"By application filed April 25, 1957, in Finance Docket No. 19742, The Belt Railway Company of Chicago (Belt Railway or Chicago Belt) requests authority under section 5(2) of the act to acquire trackage rights over the Illinois Central, the Kensington & Eastern, the South Shore, and the Pennsylvania from a point on its line at or near 95th Street to a point on the railroad tracks of the Port District on the west side of Lake Calumet Harbor, near 130th Street.

"By application filed September 9, 1957, in Finance Docket No. 19921, The Michigan Central Railroad Company, The New York Central Railroad Company, and the Indiana Harbor Belt Railroad Company applied for authority under section 5(2) of the act to acquire trackage rights on behalf of the New York Central and Indiana Harbor Belt over the lines of railroad owned or operated by the Illinois Central, the Kensington & Eastern, the South Shore, and the Pennsylvania leading to Lake Calumet Harbor Port." Illinois Central Railroad et al. Construction and Trackage Rights, 307 I.C.C. 493, 494-495 (1959) (Footnotes omitted.)

surrounding it; third, that the railroad service offered by them had been entirely satisfactory and still was. These latter two factual contentions on the part of the intervening railroads were largely undisputed. As to these the dispute lies not over the facts but over the legal conclusions which the opposite parties would seek to draw therefrom.

A subsidiary problem arose, however, during the course of the hearing before the Hearing Examiner and has continued down into the debate before the Interstate Commerce Commission and the presentation of issues to this court. This issue pertains to railroad operations within the Port District itself. The record shows that the Port District had built railroad trackage within its boundaries to serve the various docks and elevators and other port installations which the port was calculated to provide for. The basic plan for the port contemplated that all railroad operations would move over this Port District trackage. Obviously, therefore, some agreement would have to be provided among the parties if there was to be multiple railroad use as to charges to each and as to the plan of operation for the switching of cars in and out of the Port District.

Nonetheless, petitioners' applications as originally filed and as amended up to the point of the hearing before the Hearing Examiner did not request certificates of convenience and necessity for operation within the boundaries of the Port District. This was explained by petitioners' contention that no such certificates were legally required. Further, they claimed and showed that Rock Island was operating within the Port District without such a certificate. The Interstate Commerce Commission ruled otherwise.

Petitioners did, however, present an unexecuted proposed agreement designed to show a general plan of operation. This was introduced at the hearing before the Examiner and petitioners' witnesses were cross-examined by interveners in relation to it.

With this factual background before him, the Hearing Examiner entered lengthy findings of fact and recommended issuance of the certificates of convenience and necessity which the six railroads had applied for.

Extensive objections having been filed by interveners, the Interstate Commerce Commission heard oral arguments in relation to the objections and handed down a formal opinion containing findings of fact which largely duplicated those of the Hearing Examiner.

Among the important findings for which we find substantial support in this record are the following:

"Lake Calumet Port is the major deepwater port facility of the port of Chicago. It is in the heart of the Chicago railroad switching district, and is contiguous to major arterial highways. Port District facilities and industries have unparalleled access to barge, rail, lake steamer, and motor transportation, and in the immediate future there will be complete access to ocean transportation.

"The port of Chicago has been and will continue to be the major Great Lakes general cargo port insofar as export and import shipments are concerned. Also, beginning with the 1959 shipping season, that port will become a dominant export gateway for grain moving both direct to ports abroad and in some instances to Montreal for forwarding abroad.

\*     \*     \*     \*     \*     \*

"The Chicago metropolitan area embraces 3,617 square miles, and includes 5 counties in Illinois and 1 in Indiana. In addition to the city itself, the area contains approximately 180 suburban or satellite communities with a total of 14,500 manufacturing establishments employing some 2,800,000 people. The present population of the area is 6,250,000, which is expected to increase to approximately 7,900,000 persons by 1980.

\* \* \* \* \* \*

"The total wa 'rborne traffic from and to the port of Chicago for the year 1955 was 71,490,510 tons, including overseas and Canadian export and import traffic as well as waterborne domestic traffic moving on the Great Lakes and on the Illinois waterways.

\* \* \* \* \* \*

"When the St. Lawrence Seaway, with locks 800 feet long, is opened for the 1959 navigation season, and a draft of 27 feet is made available all the way from Montreal into the principal Great Lakes ports, there will be an important change in the size and capacity of the vessels engaged in Great Lakes overseas cargo transportation.

"Whereas under the conditions described the ships could not exceed 258 feet, the expectations were that beginning April 1959 the carriers using the enlarged St. Lawrence Seaway will be able to operate vessels about 400 to 450 feet in length. Against the present maximum cargo capacity of 180,000 cubic feet, the larger ships will have space for dry cargo totaling 350,000 cubic feet. In addition, they will have deep tanks ranging to about 15,000 cubic feet and space for 30,000 to 35,000 cubic feet of refrigerated cargo.

\* \* \* \* \* \*

"When the seaway is in operation, it will no longer be a question of vessel supply. The world merchant marine presently has slightly over 6,000 vessels that can navigate the enlarged St. Lawrence Seaway. These vessels total more than 25 million deadweight tons. If only 5 per cent of these ships (approximately 300 vessels) came into the Great Lakes, making 2 to 3 trips a year, there would be 600 to 900 vessels coming into the port of Chicago each season. An efficient, economical interchange of cargo between the land carriers and the watercarriers for such a volume of shipping will neces-

sitate a substantially broadened railroad service into and out of the Lake Calumet port.

\* \* \* \* \* \*

"Good, efficient, and prompt service is always important in general business, but in the field of international commerce it is mandatory.

\* \* \* \* \* \*

"*Applicants' plan of operation.*— Witnesses on behalf of the applicants emphasize the fact that a large port handling oceangoing traffic cannot efficiently operate unless adequate supporting rail facilities are available. The combined yard capacity of the applicants is 61,601 cars, or more than 12 times that presently available to serve the port through the Rock Island.

\* \* \* \* \* \*

"The record shows that, if the applications are granted, the movements over the applicants' proposed route into the port will be more direct and will not involve occupation of the South Shore tracks for a longer period of time than at present. Direct delivery by the applicants entails less handling and, being in control of the entire movement to and from the port, applicants would be in position to expedite the shipments as the occasions demand. The proposed operations also would be less expensive because of the elimination of the switching charges now absorbed on line-haul traffic.

\* \* \* \* \* \*

"Some indication of future traffic through the port may be determined from the business generated in the immediate past. At the time of the hearing the port had been in operation for a relatively short period. Witnesses for the operators of the facilities at Lake Calumet Harbor were unanimous in forecasting mate rial increases in the tonnages for the future The present facilities at the lake are not expected to be utilized to capacity for several years, and large additions are planned for early con-

struction. It is imperative, therefore, that at the very beginning of this new era of development a plan and system for handling the transportation needs of the port be established which will assure the type of service that is expected and will provide for steady progress and expansion."

It should be noted that although this last finding was preceded by a recital of the position of the applicants and that of the interveners pertaining to estimates of future port traffic, these estimates were not adopted by the Interstate Commerce Commission except as stated above.

As to the subsidiary issue pertaining to the operational plan within the Port District, the I.C.C. report of October 5, 1959, (307 I.C.C. 493) may be read as a finding of fact that such a plan was essential, but it also specifically held that supplemental applications must be filed showing the details of such an operational plan for specific certification by the Commission. Such applications were filed and ultimately, after an executed operational agreement between the six railroads and the Port District had been filed, supplemental orders were issued granting the required certificates of convenience and necessity.

As to this phase of the case, although interveners requested it, no additional hearing was ever held.

On the basis of the findings indicated above, the Commission entered original and supplemental orders [2] granting the certificates of convenience and necessity sought by the six railroads for operations up to and within the Port District.

We choose to deal with the issues in this case under separate categories: First, those pertaining to the construction of trackage and leasing agreements for operation over trackage *up to the property line of the Port District;* and secondly, those issues bearing on operations *within the Port District itself.*

### First Category

Although plaintiffs in this proceeding present a great many questions, we believe as to the first category the material issues can be fairly summarized under three headings:

First, did the intervening railroads before the Interstate Commerce Commission, the plaintiffs herein, have such rights to the rail business into and out of the Lake Calumet area by virtue of proximity and prior service to this area so as to require this court to invalidate the certificates of convenience and necessity issued to the other six railroads by the Interstate Commerce Commission?

Second, should the orders of the Interstate Commerce Commission complained of under this category be vacated because they are based upon a "stale record," i. e., was there a denial to the plaintiffs of due process of law?

Third, is there substantial evidence to support the orders of the Interstate Commerce Commission granting the six railroads certificates of convenience and necessity for the construction of trackage and trackage lease agreements up to the boundary of the Port District?

### Second Category

Issues pertaining to the certificates for operation within the Port District can be summarized in one question:

Under the full record should the supplemental orders of the Interstate Commerce Commission granting certificates of convenience and necessity for the six railroads to operate within the Port District be vacated because said supplemental orders were entered without due process to the plaintiffs?

### First Category

As to the first category of issues pertaining to the orders granting permission to operate up to the boundaries of the Port District, the major conclusions of the Interstate Commerce Commission are as follows:

"Consideration of the entire record herein warrants the conclusion

2. These supplemental orders are reported at 312 I.C.C. 277 (1960) and 317 I.C.C. 502 (1962).

that the applications should be approved. Such approval would result in greater rail competition, better service, greater car supply, and lower rates for the industries on Port District property at Lake Calumet Harbor. Direct service to the port by the applicants would place them on a par with the Rock Island insofar as solicitation of originated grain traffic for export is concerned, and the applicants would retain control of their freight equipment made empty at the port, so that such equipment could be returned in fast shuttel service to country elevators without loss of time required by interchange.

"The time has come when additional rail service at the port is required for the future development of the industries now or hereafter to be located there. Better service to shippers and receivers of freight through the elimination of delays, by providing single-line hauls, or more direct hauls, is clearly in the public interest. It would be a detriment and hindrance to the full and complete development of Lake Calumet Harbor if it were limited to the service of a single trunkline railroad when so many adjacent railroads are available and anxious to serve the port. Although the port is now served by approximately 100 common-carrier trucklines, and there is no restriction on the number of barges and ships permitted to serve the port, the Rock Island is the only railroad presently serving the port.

"Congress, the courts and this Commission have placed a higher value on future convenience and necessity than on the convenience and necessity that presently might exist in section 1(18) construction proceedings. If the applicants can prove, as they have herein, that the proposed construction either presently or in the reasonably near future is necessary to meet a public need, and will be reasonably profitable, we may issue a certificate authorizing the proposed construction. Transportation service which aids in the future development of a territory is in the public interest. Interstate Commerce Commission v. Oregon-W. R. & Nav. Co., 288 U.S. 14 [53 S.Ct. 266, 77 L.Ed. 588]. Considering all the circumstances in these proceedings, particularly the expansion program now in progress at the port, and the increased amount of rail traffic to be made available at the port, we are of the opinion that the additional service of the applicants is warranted. Gulf, M. & O. R. Co. Construction, 271 I.C.C. 541." 307 I.C.C., at 527.

We feel that this record does not offer ample support in fact and law for the conclusions of the Interstate Commerce Commission quoted above.

Title 49 U.S.C. § 1(18) gives the Interstate Commerce Commission the right to approve extensions of rail service limited only by the requirement that there be substantial showing that "present or future public convenience and necessity" require the extension:

"*Extension or abandonment of lines; certificates required; contracts for joint use of spurs, switches, etc.* No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad." 49 U.S. C. § 1(18).

It has long been held that provision of competition for shipper benefit was one

of the considerations of public convenience and necessity available to the Interstate Commerce Commission under the terms of the act. Chesapeake & Ohio Railway Co. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824 (1931); Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

### Second Category

As to the issues involved in the operation of the six railroads within the Port District, a recital of additional background facts is required.

In the original applications filed by the six railroads for certificates of convenience and necessity to bring their rail service to the Port District, as we have noted, no such certificates were requested for the operations within the boundaries of the Port District itself. It was apparently the view of the six railroads that if they were able to negotiate agreements with the Port District this took care of the matter without any I.C.C. certificate. In its original report of October 5, 1959, however, the I.C.C. ruled that such certificates of convenience and necessity were necessary for operation of the railroads concerned within the Port District itself:

> "We are of the opinion that operation by the applicants into the Port District, as proposed, constitutes an extension of a line of railroad requiring our prior approval * * *." 307 I.C.C. 493, 525.

The I.C.C. further ruled that supplementary applications must be filed seeking certificates of convenience and necessity for operations within the port, and reserved judgment on the unexecuted lease agreement which purported to show the general method of operation contemplated within the port until the filing of such supplementary applications.

The six railroads concerned thereupon complied, filing supplemental applications seeking certificates pertaining to operations within the port and the two intervening railroads then sought a hearing on these supplemental applications. A hearing on the supplemental applications was denied by the I.C.C.

Thereafter, as a result of negotiations between the six railroads and the Port District, an operating agreement was negotiated and executed which did not, however, correspond in several important particulars, including the economic terms, with that which had been previously authorized by the I.C.C.

On the filing of this executed agreement, the I.C.C. issued another supplemental order pointing out the variances and requiring the six railroads to file supplemental applications for permission to operate in accordance with the provisions of the executed agreement and withholding approval until such supplemental applications were filed. The Commission thereupon entered its final supplemental order, dated November 26, 1962, which approved the operating agreement as previously negotiated and signed. It should be noted that *at no time during this proceeding was there any hearing on the terms of the operating agreement.* In its final order the Commission dealt with this matter in the following language:

> "In our report of September 19, 1960 [312 I.C.C. 277] we held that a hearing was not necessary for a determination of the questions at issue. We also denied a request of the Rock Island for further hearing by our order of August 23, 1962. Since the general public convenience and necessity for the applicants' operations over the Port District's tracks has been determined with only the specific terms and conditions of such operations remaining for approval, and since most of the interveners' objections to the modified agreement are actually only reiterations of their objections to the overall proposals of the applicants to serve the harbor area which have been previously discussed and disposed of in our prior reports and orders herein, we do not deem it proper to revisit upon the applicants and other parties to the pro-

ceeding the additional time and expense of a hearing upon the modified agreement." 317 I.C.C. 502, 503.

■ It is clear that a certificate of convenience and necessity cannot stand unless it is based on findings of fact supported by substantial evidence. 5 U.S.C. § 1009(e).

## SUMMARY AND CONCLUSION

It appears to us that there are two fatal flaws in the proceedings and the orders of the Interstate Commerce Commission. The first concerns the sufficiency of the evidence to support the I.C.C.'s determination of public convenience and necessity, and the second concerns the denial to the plaintiffs of due process of law.

At the time of the hearing the applicants had not requested the I.C.C.'s permission to operate within the Port District. This failure was due to their belief that such requests were not necessary. The I.C.C. ruled otherwise. As a result of that ruling, the applicants presented evidence at the hearing of a proposed agreement between applicants and the Port District. On the basis of that agreement, and the other evidence presented, the I.C.C. granted the requested authority, contingent upon the proposed plan's being executed.

However, the proposed plan was not executed. Negotiations continued between the applicants and the Port District for several years, with various proposals being considered. Eventually an agreement was reached, and it was upon the basis of this agreement that the I.C.C. finally issued the certificate of public convenience and necessity, without however having granted the parties any further hearings.

One of the provisions of the agreement that was finally consummated governed the rates to be paid by the railroads as rentals to the Port District. The final agreement called for a different formula to be applied in determining the rentals payable to the Port District by the railroads for the use of the District's property. The final agreement differed from the agreement which had been previously

authorized by the I.C.C. in several important particulars, including the economic terms.

Thus we see that the I.C.C., after having said that it would issue a certificate of public convenience and necessity if the proposed plan were adopted, nevertheless granted the certificate in spite of the fact that a different plan was adopted without further hearings.

■ We have concluded that there is insufficient evidence in the record to support the Commission's determination that a certificate of public convenience and necessity should be granted to the applicants to operate within the Port District. This conclusion results from our belief that it is impossible for the Commission to make a supportable determination of public convenience and necessity unless there is adequate evidence in the record as to operating costs. It cannot be disputed that one of the important elements which must be considered in determining whether a certificate of public convenience and necessity should issue is whether the operation can be profitably undertaken. We fail to see how a decision on potential profitability can be made unless there is a record which shows what the operating costs will be. A major deficiency exists because the rental provisions under the final plan differ materially from the rental provisions under the plan originally proposed.

■ The record shows what the rental rates will be, but does not show what effect those rates will have on the overall operating costs. This is important because the rental is dependent upon the number of cars handled. The only evidence on the effect of specific rates relates to the proposed rates which never were put into effect. Certainly, to support a grant of public convenience and necessity, a record should contain evidence as to what impact the rental charges will have upon the profitability of the venture. A hearing following the execution of the final agreement between the applicants and the Port District would have provided that evidence.

The plaintiffs, although not parties to the final agreement, will be required to operate under the terms of the agreement entered into between their adversaries and the Port District. They were not given an opportunity to present evidence or to cross-examine the contracting parties concerning the agreement. The fact that plaintiffs did have some opportunity to introduce evidence and to cross-examine in regard to the original proposed agreement does not rectify this omission. The failure to give plaintiffs timely notice before the hearing upon the final agreement was contrary to the Administrative Procedure Act and the rules which Section 1(18) of the Interstate Commerce Act states must be observed; these statutes reflect the constitutional requirements of due process.

█ It is our conclusion that the Commission's failure to give plaintiffs an opportunity to introduce evidence and to cross-examine witnesses in regard to the various managerial and economic aspects of the final plan, by which they were bound, constituted a denial to them of due process of law

It is our further conclusion that the I.C.C. is required to reconsider the issue of public convenience and necessity with reference to the operations up to the boundaries of the Port District by conducting a complete rehearing. The tracks outside the Port District go only to the boundaries of the District, and the only purpose of building them will be to enable the applicants to operate within the District.

We have concluded that a rehearing is required upon all of the issues for the reason that the operation of railroad services up to the boundaries of the Port District cannot be considered apart from the railroad operation within the Port District.

The original order of the I.C.C. and the supplemental orders dated September 19, 1960, August 23, 1962, and November 26, 1962, will be vacated and the case will be remanded for the taking of further evidence upon all issues raised herein.

EDWARDS, Circuit Judge, dissents.

EDWARDS, Circuit Judge (dissenting).

This case was heard January 24, 1964. The following opinion was drafted (as its form clearly indicates) as a proposed opinion of the Court and served on April 10, 1964. My colleagues on this Court have responded with a quite different view. With all respect, I tender my original thoughts as a dissent. The only changes are those required to phrase the opinion in the singular.

This litigation arises out of the national expectation that the completion of the St. Lawrence Seaway will bring a great increase in ocean-going freight to Great Lakes ports in the heartland of the continent.[1] Chicago, the largest city on the Great Lakes, created the Chicago Regional Port District to build a new harbor to serve this traffic. The Port District prepared docks for the ships to load and unload and trackage for railroad freight cars to serve the docks. Two railroads were closest at hand; six others sought Interstate Commerce Commission permission to build trackage to connect with the Port District. This legal battle has resulted.

These complaints were filed by two railroads to seek an injunction under Title 28 U.S.C. §§ 1336, 2284 and 2321–2325, incl., against certain orders of the Interstate Commerce Commission which authorized six other operating railroads to extend their tracks so as to offer direct services to the newly organized Chicago Regional Port District at Lake Calumet near Chicago, Illinois.

One of the two railroads, The New York, Chicago and St. Louis (henceforth

1. For official action in this respect, see Agreement with Canada on St. Lawrence Seaway navigation facilities, June 30, 1954, 5 U.S.T. & O.I.A. 1784, T.I.A.S. No. 3053, U.N.T.S. 210; 33 U.S.C. Chapt. 19, §§ 981–990; Exec.Order No. 10534, June 9, 1954, F.R. 3413 as amended by Exec.Order No. 10771, June 23, 1958, 23 F.R. 4525.

the Nickel Plate) has a line so constructed as to parallel and be prepared to serve the east side of Lake Calumet. The other complainant, the Chicago, Rock Island and Pacific Railroad Company and the Pullman Railroad Co. (henceforth Rock Island) has trackage adjacent to the west side of Lake Calumet and has been providing service for such port facilities as previously existed at Lake Calumet for many years.

The six operating railroads (whose "invasion" of the Lake Calumet area is resisted by Nickel Plate and Rock Island) initiated the original proceeding before the Interstate Commerce Commission by a series of applications filed, starting in 1956. These applications sought I.C.C. approval of the construction of the necessary trackage and trackage right agreements to interconnect various of the six railroads to each other and ultimately to the Chicago Port District tracks at Lake Calumet.[2] Subsequent supplemental applications and amendments sought approval likewise of an agreement between the six railroads and the Chicago Port District for operations within the Port District.

Lengthy hearings were held before the I.C.C. Hearing Examiner in 1957 at which

2. "By application filed October 22, 1956, in Finance Docket No. 19538, the Kensington and Eastern Railroad Company [a nonoperating company], the Illinois Central Railroad Company, The Philadelphia, Baltimore and Washington Railroad Company [a nonoperating company], and The Pennsylvania Railroad Company applied under section 1(18) of the act for authority to construct a line of railroad, approximately 1.431 miles, in Cook County, Ill. The initial segment of 2,900 feet, or 0.549 mile, would be constructed by the Kensington & Eastern at an estimated cost of $222,596; the next 630 feet, or 0.119 mile, would be built by the Illinois Central at an estimated cost of $35,886; and the final 4,030 feet, or 0.763 mile, would be constructed by the Pennsylvania in behalf of the Philadelphia, Baltimore & Washington at an estimated cost of $604,-094. Each applicant is to finance its proposed construction from current funds available in their respective treasuries. The track will lead out from the westbound main line of the Kensington & Eastern at a point a short distance east of Doty Avenue and then extend east and north to a connection with the proposed track of Pennsylvania on land owned by the Pennsylvania. A portion of the Pennsylvania construction would be on property leased from the Chicago Regional Port District, hereinafter referred to as the Port District. The connection between the Illinois Central and the Pennsylvania segments would be made at about 130th Street, and the Pennsylvania track, in turn, would connect with the track owned by the Port District.

"In the same application, the Illinois Central, the Pennsylvania, and the Chicago South Shore and South Bend Railroad (South Shore) seek authority under section 5(2) of the act for the acquisition of trackage rights over the line to be constructed and certain existing tracks over which it is necessary to operate in order to reach the Lake Calumet Harbor Port, hereinafter sometimes called the harbor or port. The railroad properties of the Kensington & Eastern are leased to and are operated by the South Shore. A crossover would be installed between the eastbound and westbound tracks of the Kensington & Eastern, immediately west of the connection with the track leading to the port, to enable trains coming to the harbor to cross from the eastbound to the westbound track of the Kensington & Eastern to enter the track leading to the port.

"By application filed April 25, 1957, in Finance Docket No. 19742, The Belt Railway Company of Chicago (Belt Railway or Chicago Belt) requests authority under section 5(2) of the act to acquire trackage rights over the Illinois Central, the Kensington & Eastern, the South Shore, and the Pennsylvania from a point on its line at or near 95th Street to a point on the railroad tracks of the Port District on the west side of Lake Calumet Harbor, near 130th Street.

"By application filed September 9, 1957, in Finance Docket No. 19921, The Michigan Central Railroad Company, The New York Central Railroad Company, and the Indiana Harbor Belt Railroad Company applied for authority under section 5(2) of the act to acquire trackage rights on behalf of the New York Central and Indiana Harbor Belt over the lines of railroad owned or operated by the Illinois Central, the Kensington & Eastern, the South Shore, and the Pennsylvania leading to Lake Calumet Harbor Port." Illinois Central Railroad, et al. Construction and Trackage Rights, 307 I.C.C. 493, 494-495 (1959) (Footnotes omitted.)

Rock Island and Nickel Plate intervened on leave granted and objected.

The first witness at the hearings was the general manager of the Chicago Regional Port District who gave the following history of the development:

"The development of Lake Calumet Harbor is something that has been thought about and planned for the last 37 years. The original plan for the development of Lake Calumet Harbor was drafted by Arend Van-Vlissingen in 1920. The basis of this plan was the development of 2250 acres of land and water. The Regional Port District came into existence in 1951 as a result of legislation which was fostered by a sound concept that something had to be done to develop port and harbor facilities in the City of Chicago. From 1951 to 1953 the powers of the Regional Port District were limited. It wasn't until 1953 that the Illinois Legislature granted to the Port District the right to issue its own Revenue Bonds as a result of which the Port District as such could go ahead and make some definite plans for a development. I came with the Port District in the fall of 1953. Before becoming affiliated with the Chicago Regional Port District I was the Manager of Marine Traffic of very large facilities and my record speaks for itself in the promotion of this particular type of activity. The Chicago Regional Port District procured a Quit Claim Deed to the bed of Lake Calumet from the City of Chicago in the spring of 1955, and within almost 4 months thereafter the foundation for a practical plan for financing was put together.

"In 1955 the Port District again realized that the concept of the Port District Act had to be changed because it felt its best public interest would be served by having the law changed so that all of the facilities which it was empowered to create, as well as those which it would develop over a period of years, would,

by law, be turned into private hands for lease and operation. To the best of our knowledge this is the only port authority or board of its type any place in the world that by law has the right to do this. It is important to understand that these facilities, while they have been created by municipal action, are not operated by this municipal corporation, that each facility in itself is a separate entity in the hands of a private operator, which, of course, puts an entirely different complexion on this development.

"On October 1, 1955, we were able to procure the proceeds from the sale of bonds and we were able to finish these facilities within the allotted time and within the amount of money that we had to spend. When we were ready to go ahead with our first stage of development we made it very plain that these facilities were being constructed to handle a complete interchange of domestic business, intrastate, interstate, as well as import and export freight, and it was because of the flexibility and the wide contact that these facilities would have that we were able to lease these facilities when we did.

"On July 1, 1957, we presented to the State of Illinois a revised plan for this development which was approved by the State of Illinois. In this plan we sought to place on one side of the lake all of the facilities that would be adaptable for commercial purposes such as grain elevators, warehouses, cold storage places, trucking terminals, transit sheds and any of the other developments that would come with a commercial setup. It was laid out in that particular fashion because we sought to expose as much of the property as we could to water contact as well as rail contact. It is impractical to conceive of a development of this nature and size without having all of the rail and truck access because no

great area of this type can be created without having a fusion of all of these facilities, and the harbor which we laid out follows more or less a pattern seen in Antwerp, Hamburg, Rotterdam and places like that where over a long period of years the authorities sought to bring into certain areas all of these facilities.

"With respect to industrial setup, the area offered undeniable advantages because raw material could come in by barge or vessel and here be fabricated and processed and shipped away by rail and truck. The development itself offers a composite setup. The area which is east of Lake Calumet should, in some form or another, be added to the harbor complexion, not particularly under the ownership or management of Chicago Regional Port District but the property development as such should be fused in with the lake so that instead of 2000 acres, such as we have now, there would be available a little better than 3000 acres of land which could be integrated into a comprehensive layout and all of the exposures of the slips on the east side have been laid out in that particular fashion so that by pipe line, conveyor, or in any other method the movement of raw materials might go from those areas in and out of the harbor."

The resolution of the Chicago Regional Port District Board of January 15, 1954, pertaining to railroad policy was read into the record by this witness:

"In pursuance of its duty, the Port District Board at its regular meeting under date of January 15, 1954, adopted the following resolution:

" 'Be It Resolved That the Chicago Regional Port District reaffirm and restate its railroad policy for Lake Calumet Harbor which policy unequivocably is that the public interest as well as the interests of prospective tenants and users of the Lake Calumet Harbor will be best served by making available to them all accessible railroad service on equal basis, and under no circumstances that a monopoly or exclusive privilege shall be granted to any single railroad carriers to serve the Lake Calumet Harbor.

" 'Furthermore, that it shall be the declared policy of the Chicago Regional Port District to foster and attract railroad carriers which have a primary interest in the development of the Lake Calumet Harbor as a rail-truck-barge-ship interchange harbor.' "

And the same witness recited five reasons for the Port District favoring multiple railroad line service:

"The 5 reasons which I gave the Port District Board as to why service by more than one railroad was advisable may be stated as follows:

"First, a district of this particular type if it was served by belt lines, or more railroads, would have more possibilities of 1 and 2-line hauls instead of 3-line hauls. The second reason was the possibility of a strike. If there was a strike on the railroad serving—and we only had one railroad—that all service in and out of the Port District would be stopped and we would be badly, let's say, confused and confined to troubles if this was the case. The third reason was the necessity for car supply. If more railroads were there, more railroads could be called upon to supply cars. The fourth reason was that if more railroads were in, there would be more competition, and naturally we would get better service. The fifth reason we discussed was the philosophy of a Port of our type in business through an Act of the Legislature trying to serve the public interest, that it was unfair to monopolize the service for one railroad. There was one other reason. I tried to explain to our directors if the Belt Railway Company of Chicago was serving the harbor, that more of their lines, because they were owners, could be

contacted directly for, let's say, a better understanding of import and export rates and that I felt these contacts that could be had would be beneficial to the Port, and because of their over-all interest, that we might get better acceptance and quicker establishment of these rates."

Estimates of tonnage anticipated to be handled through the Port subsequent to the opening of the St. Lawrence Seaway made by various witnesses for the petitioners before the Hearing Examiner ran from 30,000,000 tons per year to 58,000,000 tons per year, with grain and coal believed likely to constitute the bulk of this tonnage.

Rock Island's witness, Mr. Marvin Pair, Professor of Economics and Transportation at Tulane University, presented the pessimistic view of the matter at this hearing. He made some detailed comments on the problems of moving deep-sea traffic through the Seaway and concluded: "I do not see how I or anyone can make an accurate estimate of the export and import traffic which will move in and out of the Port."

But this witness also said:

"All I have said about the future of traffic was stated merely to show the impossibility of forecasting of traffic with any degree of accuracy. Notwithstanding what I have said, Lake Calumet Port, as I said before, has a promising future, because of a good plan, room for development, a territory from which to draw, and presence of bulk commodity traffic, but time alone will tell what volume of traffic will move in and out of the port, and how much of it will move by rail. Grain traffic undoubtedly will represent a substantial portion of the port's business because of the presence of large elevator storage capacity there. What portion of the total volume of this traffic will be moved by railroad to and from the port is difficult to say."

Extensive testimony was also taken from representatives of shipping and importing firms and concerns which had prospective economic relationships with the development of the proposed Port District. Typical of the testimony of the ultimate users of the Port District was this testimony from Thomas H. Coulter, representing the Chicago Association of Commerce and Industry, who stated:

"It is the position of our association that the best interests of Chicago and the Chicago Port District would be served if more than one carrier were given access to port facilities and serve the Chicago Regional Port District."

He continued:

"[I]n my opinion it [the increase in rail service] will benefit shippers in that large section of the midwest that uses the Port of Chicago for export and import traffic, and on other traffic interchanged between different types of carriers at Port District facilities."

When asked for reasons to substantiate this opinion the witness gave a detailed analysis of past and projected industrial and agricultural growth in the Chicago area and the midwest. In addition, the witness gave figures on the number of new shipping lines which called at the Chicago port, as well as those which were expected to use the port upon completion of the Seaway. Based on this analysis the witness concluded:

"With this additional service it is anticipated that over-seas export and import traffic will increase substantially, and that within five years the traffic moving through the Port of Chicago is estimated at one and one-half million tons, or six times its present volume.

\*     \*     \*     \*     \*     \*

"To take care of this increased traffic, we will need within the next decade all of the port facilities now being planned for the convenience of industries located within the Port

District, within the Chicago metropolitan area and for all shippers and receivers of export and import traffic through the Port of Chicago. We feel that additional rail lines should be permitted to serve the Chicago Regional Port District."

The above is only a sample of the evidence included in the lengthy record of over 1500 typed pages developed before the Hearing Examiner for the I.C.C. While what I have quoted herein is principally the testimony of the petitioners, it is highly relevant to the instant case, since in this proceeding the basic question is not the wisdom or correctness of the administrative decision of the Interstate Commerce Commission, but whether or not there was substantial evidence to uphold it.

The evidence submitted at the hearing before the I.C.C. Hearing Examiner by interveners in that proceeding who are plaintiffs in this one, bore principally upon three points: First, that the prospects of the port were not as rosy as the estimates of its proponents who testified before the Commission would have liked for the Commission to believe.

Secondly, that the two intervening railroads, plaintiffs herein, either were serving or were available to serve the port and the general area surrounding it.

Third, that the railroad service offered by them had been entirely satisfactory and still was.

These latter two factual contentions on the part of the intervening railroads were largely undisputed. As to these the dispute lies not over the facts but over the legal conclusions which the opposite parties would seek to draw therefrom.

As to the first contention pertaining to the prospects of the port, the nature of defendant's testimony in that regard has already been indicated above.

A subsidiary problem arose, however, during the course of the hearing before the Hearing Examiner and has continued down into the debate before the I.C.C. and the presentation of issues to this court. This issue pertains to railroad operations within the Port District itself. The record shows that the Port District had built railroad trackage within its boundaries to serve the various docks and elevators and other Port installations which the Port was calculated to provide for. The basic plan for the Port contemplated that all railroad operations would move over this Port District trackage. Obviously, therefore, some agreement would have to be provided among the parties if there was to be multiple railroad use as to charges to each and as to the plan of operation for the switching of cars in and out of the Port District.

Nonetheless, petitioners' applications as originally filed and as amended up to the point of the hearing before the Hearing Examiner, did not request certificates of convenience and necessity for operation within the boundaries of the Port District. This was explained by petitioners' contention that no such certificates were legally required. Further, they claimed and showed that Rock Island was operating within the Port District without such a certificate.

Petitioners did, however, present an unexecuted proposed agreement designed to show a general plan of operation. This was introduced at the hearing before the Examiner and petitioners' witnesses were cross-examined by interveners in relation to it.

With this factual background before him, the Hearing Examiner entered lengthy findings of fact and recommended issuance of the certificates of convenience and necessity which the six railroads had applied for.

Extensive objections having been filed by interveners, the Interstate Commerce Commission heard oral arguments in relation to the objections and handed down a formal opinion containing findings of fact which largely duplicated those of the Hearing Examiner.

Among the important findings for which I find substantial support in this record are the following:

"Lake Calumet Port is the major deepwater port facility of the port

of Chicago. It is in the heart of the Chicago railroad switching district, and is contiguous to major arterial highways. Port District facilities and industries have unparalleled access to barge, rail, lake steamer, and motor transportation, and in the immediate future there will be complete access to ocean transportation.

"The port of Chicago has been and will continue to be the major Great Lakes general cargo port insofar as export and import shipments are concerned. Also, beginning with the 1959 shipping season, that port will become a dominant export gateway for grain moving both direct to ports abroad and in some instances to Montreal for forwarding abroad.

\*     \*     \*     \*     \*     \*

"The Chicago metropolitan area embraces 3,617 square miles, and includes 5 counties in Illinois and 1 in Indiana. In addition to the city itself, the area contains approximately 180 suburban or satellite communities with a total of 14,500 manufacturing establishments employing some 2,800,000 people. The present population of the area is 6,250,000, which is expected to increase to approximately 7,900,000 persons by 1980.

\*     \*     \*     \*     \*     \*

"The total waterborne traffic from and to the port of Chicago for the year 1955 was 71,490,510 tons, including overseas and Canadian export and import traffic as well as waterborne domestic traffic moving on the Great Lakes and on the Illinois waterways.

\*     \*     \*     \*     \*     \*

"When the St. Lawrence Seaway, with locks 800 feet long, is opened for the 1959 navigation season, and a draft of 27 feet is made available all the way from Montreal into the principal Great Lakes ports, there will be an important change in the size and capacity of the vessels engaged in Great Lakes overseas cargo transportation.

"Whereas under the conditions described the ships could not exceed 258 feet, the expectations were that beginning April 1959 the carriers using the enlarged St. Lawrence Seaway will be able to operate vessels about 400 to 450 feet in length. Against the present maximum cargo capacity of 180,000 cubic feet, the larger ships will have space for dry cargo totaling 350,000 cubic feet. In addition, they will have deep tanks ranging to about 15,000 cubic feet and space for 30,000 to 35,000 cubic feet of refrigerated cargo.

\*     \*     \*     \*     \*     \*

"When the seaway is in operation, it will no longer be a question of vessel supply. The world merchant marine presently has slightly over 6,000 vessels that can navigate the enlarged St. Lawrence Seaway. These vessels total more than 25 million deadweight tons. If only 5 per cent of these ships (approximately 300 vessels) came into the Great Lakes, making 2 to 3 trips a year, there would be 600 to 900 vessels coming into the port of Chicago each season. An efficient, economical interchange of cargo between the land carriers and the water carriers for such a volume of shipping will necessitate a substantially broadened railroad service into and out of the Lake Calumet port.

\*     \*     \*     \*     \*     \*

"Good, efficient, and prompt service is always important in general business, but in the field of international commerce it is mandatory.

\*     \*     \*     \*     \*     \*

"*Applicants' plan of operation.*— Witnesses on behalf of the applicants emphasize the fact that a large port handling oceangoing traffic cannot efficiently operate unless adequate supporting rail facilities are available. The combined yard capacity of the applicants is 61,601 cars, or more than 12 times that presently

available to serve the port through the Rock Island.

\* \* \* \* \* \*

"The record shows that, if the applications are granted, the movements over the applicants' proposed route into the port will be more direct and will not involve occupation of the South Shore tracks for a longer period of time than at present. Direct delivery by the applicants entails less handling and, being in control of the entire movement to and from the port, applicants would be in position to expedite the shipments as the occasions demand. The proposed operations also would be less expensive because of the elimination of the switching charges now absorbed on line-haul traffic.

\* \* \* \* \* \*

"Some indication of future traffic through the port may be determined from the business generated in the immediate past. At the time of the hearing the port had been in operation for a relatively short period. Witnesses for the operators of the facilities at Lake Calumet Harbor were unanimous in forecasting material increases in the tonnages for the future. The present facilities at the lake are not expected to be utilized to capacity for several years, and large additions are planned for early construction. It is imperative, therefore, that at the very beginning of this new era of development a plan and system for handling the transportation needs of the port be established which will assure the type of service that is expected and will provide for steady progress and expansion."

It should be noted that although this last finding was preceded by a recital of the position of the applicants and that of the interveners pertaining to estimates of future port traffic, these estimates were not adopted by the I.C.C. except as stated above.

As to the subsidiary issue pertaining to the operational plan within the Port District, the I.C.C. report of October 5, 1959 (307 I.C.C. 493), may be read as a finding of fact that such a plan was essential, but it also specifically held that supplemental applications must be filed showing the details of such an operational plan for specific certification by the Commission. Such applications were filed and ultimately, after an executed operational agreement between the six railroads and the Port District had been filed, supplemental orders were issued granting the required certificates of convenience and necessity.

As to this phase of the case, although interveners requested it, no additional hearing was ever held.

On the basis of the findings indicated above, the Commission entered original and supplemental orders [3] granting the certificates of convenience and necessity sought by the six railroads for operations up to and within the Port District.

I choose to deal with the issues in this case under separate categories: first, those pertaining to the construction of trackage and leasing agreements for operation over trackage *up to the property line of the Port District*. And, secondly, those issues bearing on operations *within the Port District itself*.

### First Category

Although plaintiffs in this proceeding present a great many questions, I believe as to the first category the material issues can be fairly summarized under three headings.

First, did the intervening railroads before the I.C.C., the plaintiffs herein, have vested rights to the rail business into and out of the Lake Calumet area by virtue of proximity and prior service to this area so as to require this court to invalidate the certificates of convenience and necessity issued to the other six railroads by the I.C.C.?

Second, should the orders of the I.C.C. complained of under this category be

3. These supplemental orders are reported at 312 I.C.C. 277 (1960) and 317 I.C.C. 502 (1962).

vacated because they are based upon a "stale record" in that comparing figures sought to be presented subsequently by plaintiffs herein, the actual freight moving into and out of the Lake Calumet Port District has been substantially less than the estimates presented at the I.C.C. hearing?

Third, is there substantial evidence to support the orders of the I.C.C. granting the six railroads certificates of convenience and necessity for the construction of trackage and trackage lease agreements up to the boundary of the Port District?

### Second Category

The issues can be summarized in one question:

Under the full record should the supplemental orders of the I.C.C. granting certificates of convenience and necessity for the six railroads to operate within the Port District be vacated because said supplemental orders were entered without hearing?

### First Category

As to the first category of issues pertaining to the orders granting permission to operate up to the boundaries of the Port District, the major conclusions of the I.C.C. are as follows:

"Consideration of the entire record herein warrants the conclusion that the applications should be approved. Such approval would result in greater rail competition, better service, greater car supply, and lower rates for the industries on Port District property at Lake Calumet Harbor. Direct service to the port by the applicants would place them on a par with the Rock Island insofar as solicitation of originated grain traffic for export is concerned, and the applicants would retain control of their freight equipment made empty at the port, so that such equipment could be returned in fast shuttle service to country elevators without loss of time required by interchange.

"The time has come when additional rail service at the port is required for the future development of the industries now or hereafter to be located there. Better service to shippers and receivers of freight through the elimination of delays, by providing single-line hauls, or more direct hauls, is clearly in the public interest. It would be a deteriment and hindrance to the full and complete development of Lake Calumet Harbor if it were limited to the service of a single trunkline railroad when so many adjacent railroads are available and anxious to serve the port. Although the port is now served by approximately 100 common-carrier trucklines, and there is no restriction on the number of barges and ships permitted to serve the port, the Rock Island is the only railroad presently serving the port.

"Congress, the courts, and this Commission have placed a higher value on future convenience and necessity than on the convenience and necessity that presently might exist in section 1(18) construction proceedings. If the applicants can prove, as they have herein, that the proposed construction either presently or in the reasonably near future is necessary to meet a public need, and will be reasonably profitable, we may issue a certificate authorizing the proposed construction. Transportation service which aids in the future development of a territory is in the public interest. Interstate Commerce Commission v. Oregon-W. R. & Nav. Co., 288 U.S. 14 [53 S.Ct. 266, 77 L.Ed. 588]. Considering all the circumstances in these proceedings, particularly the expansion program now in progress at the port, and the increased amount of rail traffic to be made available at the port, we are of the opinion that the additional service of the applicants is warranted. Gulf, M. & O. R. Co. Construction, 271 I.C.C. 541." 307 I.C.C., at 527.

I feel that this record offers ample support in fact and law for the conclusions of the Interstate Commerce Commission quoted above.

First, exclusive rights in perpetuity to railroad business are not created by proximity and prior service, however adequate that service may have been. Indian Valley R. R. v. United States, 52 F.2d 485, (N.D.Cal.1931); Pennsylvania Railroad v. United States, 40 F.2d 921 (W.D. Pa.1930).

The Illinois Supreme Court opinion in the I.C.C. case, Chicago, Rock Island & Pacific Railroad et al v. Illinois Commerce Commission ex rel., 414 Ill. 134, 111 N.E.2d 136 (1953), which plaintiff Rock Island relies upon so strongly, is patently not controlling precedent in relation to federal law.

Title 49 U.S.C. § 1(18) gives the Interstate Commerce Commission the right to approve extensions of rail service limited only by the requirement that there be substantial showing that "present or future public convenience and necessity" require the extension:

> "*Extension or abandonment of lines; certificates required; contracts for joint use of spurs, switches, etc.* No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad." 49 U.S.C. § 1(18).

It has long been held that provision of competition for shipper benefit was one of the considerations of public convenience and necessity available to the I.C.C. under the terms of the act. Chesapeake & Ohio Railway Co. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824 (1931); Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

The first of these cases phrases the matter thus:

> "In the absence of a plain declaration to that effect, it would be unreasonable to hold that Congress did not intend to empower the Commission to authorize construction of new lines to provide for shippers such competing service as it should find to be convenient or necessary in the public interest." Chesapeake & Ohio Railway Co. v. United States, supra, 283 U.S. at 42, 51 S.Ct. at 339.

The second of these cases in interpreting the effect of the National Transportation Policy amendments of 1940 quoted this language with approval:

> " '[N]o carrier is entitled to protection from competition in the continuance of a service that fails to meet a public need, nor, by the same token, should the public be deprived of a new and improved service because it may divert some traffic from other carriers.' " Schaffer Transportation Co. v. United States, supra, 355 U.S. at 91, 78 S.Ct. at 178.

Second, in its presentation of the "stale record" argument, plaintiffs rely principally upon a single case, Atchison, Topeka & Santa Fe Railway Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932). (See also State of Oklahoma by and through Corp. Comm. v. United States, 193 F.Supp. 261 (W.D. Okl., 1960)). In this case certain I.C.C. rate orders which affected the entire economic future of the railroad were based upon a record written entirely in a period prior to the happening of the major depression of the 1930's, but said orders were scheduled to become effective well after the impact of that depression. In this situation the court took judicial notice of that which no living human being

in the country could fail to be aware of, and vacated the orders and granted rehearings on the changed economic circumstances.

Here the complaint is that the facts have not measured up to the predictions of increased freight tonnage moving into and out of the Port District up to the time the matter was argued before this court. It is suggested that on this ground the entire proceeding be reopened with the taking of further testimony which would show more accurately the prospect and future of this port

As I have noted, the Commission had before it testimony of the petitioning six railroads, plus testimony presented by the two intervening railroads. The testimony presented by petitioners was distinctly optimistic in relation to the future of the Port District. The testimony presented by the interveners in comparison was distinctly pessimistic. As I have noted, however, the I.C.C. report was *not* based on the specific estimates of the witnesses for the applicants. The significant thing is that the record fails to disclose any testimony which denies that the Lake Calumet Harbor facility proposed to be operated by the Chicago Regional Port District has a promising future with reasonable contemplation of material increases in tonnage of freight moving through it.

Under these circumstances it does not appear to me that the results of a few years of operations (which plaintiffs here seek to show) would invalidate the basic findings and conclusions entered by the I.C.C. in relation to the prospects and future of the Port District, and the question of convenience and necessity for added rail service. In my judgment the denial of rehearing was clearly within the Commission's discretion. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). Nor do I find any denial of due process on this issue.

Third, the major issue in this category, of course, is whether or not there is substantial evidence to support the findings of the Interstate Commerce Commission and its orders granting certificates of convenience and necessity for six additional railroads to serve this port.

Most of what has been said to this point in this opinion furnishes background and substantiation for my answer. In addition to testimony pertaining to the strategic location of the port and its prospects for future expansion of freight usage, I have referred to the expert testimony which detailed the advantages in port operation of multiple railroad service. These advantages include such major factors as single-line service and rates, multiple-line service in the event of a rail strike by one road, the vastly increased number of freight cars made available under the expanded rail service to the Port District, and the use of the extensive additional marshaling yards made available for Port District service by the addition of the six railroads. There is established precedent for the I.C.C. to consider all of these factors as important aspects of its determination of "present or future public convenience and necessity." Chesapeake & Ohio Railway Company v. United States, supra; Interstate Commerce Commission v. Oregon-Washington Railroad & Navigation Company, 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588 (1933).

Further, it seems to be the policy of the Interstate Commerce Commission—as expressed herein and elsewhere—on a showing of public interest to make public terminal facilities generally available to all railroads which are so located as to be able to render practical service. Atchison, Topeka & Santa Fe Railway Company Construction, 261 I.C.C. 227 (1945); City of Milwaukee v. Chicago & North Western Railway Company, 279 I.C.C. 521 (1950).

It is interesting to note that this policy was applied in this same I.C.C. order in favor of Rock Island in relation to service to The Calumet Harbor Terminals, Inc.—a privately-owned and operated ter-

minal adjacent to the Port District and now owned by the Pennsylvania Railroad. (See 49 U.S.C. § 3(5)).

On the record taken as a whole, the orders of the Commission dated October 5, 1959, are amply supported by substantial evidence and are held to be within its statutory discretion.[4]

### Second Category

As to the issues involved in the operation of the six railroads within the Port District, a recital of additional background facts is required.

In the original applications filed by the six railroads for certificates of convenience and necessity to bring their rail service to the Port District, as I have noted, no such certificates were requested for the operations within the boundaries of the Port District itself. It was apparently the view of the six railroads that if they were able to negotiate agreements with the Port District, this took care of the matter without any I.C.C. certificate. In its original report of October 5, 1959, however, the I.C.C. ruled that such certificates of convenience and necessity were necessary for operation of the railroads concerned within the Port District itself:

"We are of the opinion that operation by the applicants into the Port District, as proposed, constitutes an extension of a line of railroad requiring our prior approval. * * " 307 I.C.C. 493, 525.

The I.C.C. further ruled that supplementary applications must be filed seeking certificates of convenience and necessity for operations within the port, and reserved judgment on the unexecuted lease agreement which purported to show the general method of operation contemplated within the port until the filing of such supplementary applications.

The six railroads concerned thereupon complied, filing supplemental applications seeking certificates pertaining to operations within the port and the two intervening railroads then sought a hearing on these supplemental applications. A hearing on the supplemental applications was denied by the I.C.C.

Thereafter, as a result of negotiations between the six railroads and the Port District, an operating agreement was negotiated and executed which did not, however, correspond in several important particulars (including the economic terms) with that which had been previously authorized by the I.C.C.

On the filing of this executed agreement, the I.C.C. issued another supplemental order pointing out the variances and requiring the six railroads to file supplemental applications for permission to operate in accordance with the provisions of the executed agreement and withholding approval until such supplemental applications were filed. Subsequently, supplemental applications were filed. The Commission thereupon entered its final supplemental order, dated November 26, 1962, which approved the operating agreement as previously negotiated and signed. It should be noted that at no time during this proceeding was there any hearing on the terms of the operating agreement. In its final order the Commission dealt with this matter in the following language:

"In our report of September 19, 1960 [312 I.C.C. 277] we held that a hearing was not necessary for a determination of the questions at issue. We also denied a request of the Rock Island for further hearing by our order of August 23, 1962. Since the general public convenience and necessity for the applicants' operations over the Port District's tracks has been determined with only the specific terms and conditions of such operations remaining for approval, and since most of the interveners' objections to the modified agreement are actually only reit-

---

4. By so saying I specifically indicate consideration and rejection of the strained statutory construction sought by plain-

tiff Nickel Plate in section D.3. of its brief.

erations of their objections to the overall proposals of the applicants to serve the harbor area which have been previously discussed and disposed of in our prior reports and orders herein, we do not deem it proper to revisit upon the applicants and other parties to the proceeding the additional time and expense of a hearing upon the modified agreement." 317 I.C.C. 502, 503.

It appears to me that the Commission has taken the point of view that since it had before it a factual record which it felt provided a sufficient basis for a finding of convenience and necessity, that the six railroads should be permitted to serve the Port District, and since the plan for such service clearly calls for and implies the necessity of operation within the Port District, that, therefore, on the filing by the six railroads of appropriate supplemental applications seeking certificates of convenience and necessity for the operations within the Port District, the Interstate Commerce Commission had before it sufficient factual information from the prior hearing to approve the plan of operation thus brought to its attention.

In contending that no additional hearing was necessary in relation to this phase of the case, counsel for the I.C.C. points out that the statute does not in terms require a hearing, and argues further that the issues pertaining to the operating agreement which were settled by negotiation between the six railroads and the Port District were in the view of the I.C.C. only technicalities necessary to implement a general plan of operation as to which adequate testimony had been taken before the Commission in the original hearing.

In his argument counsel for the I.C.C. relied upon the "arm's length negotiations" between the six railroads and the Port District which resulted in the ultimate economic terms which were incorporated in the operating agreement.

Whatever might be the situation if all of the railroads interested in serving the Port District had participated in those negotiations and had signed the agreement and submitted it to the I.C.C., this is patently not the picture which we have before us. Two of the railroads with a direct and continuing interest in service to the Port District—one of which is, indeed, the only one currently serving it—obviously have tremendous economic and operating interests in the agreement negotiated between six of their competitors and the Port District without their participation.

I am not oblivious of the fact that the I.C.C. has gone to some lengths to protect certain of the interests of the plaintiffs herein. The original I.C.C. order of October 5, 1959, required a nonexclusionary redraft of the proposed operating agreement which in its original terms would have put Rock Island's continued service to the Port District entirely at the mercy of its six competitors.

But, no matter how fair its motives or how great its expertise, I doubt that such factors in a public commission can safely be substituted for the right of a company engaged in economic competition in a proper hearing to state its own position and advance its own claims as to matters vital to its interests. Such a hearing is provided for in the act.

Moreover, it is clear that a certificate of convenience and necessity cannot stand unless it is based on findings of fact supported by substantial evidence. 5 U.S.C. § 1009(e); Pennsylvania Railroad v. United States, supra; Interstate Commerce Commission v. City of Jersey City, supra.

In relation to the supplemental orders of the I.C.C. to which I have referred, I do not find such substantial evidence. In fact, there is no evidentiary record at all upon which the I.C.C. approval of the detailed operating plan of the six railroads within the Port District or the economic terms of the operating agreement could be based.

I note the suggestion, of course, that the operating agreement "arrived at through arm's length bargaining" which

**996**

was submitted to the I.C.C. is sufficient evidence to support the details of the operating plan, and that the necessity of some plan was clearly forecast by the volume of evidence at the first hearing.

As to the necessity for an operating plan with the Port District, I have no doubt that ample evidence was presented at the original hearing. As to the detailed operational and financial features of the agreement executed between the six railroads and the Port District, we have another matter.

The executed agreement was not evidence which could be regarded as binding upon the intervening railroads before the I.C.C. Their interests were directly affected both as to how their cars would get into and out of the Port District and as to what they would have to pay for the services. To a railroad company like Rock Island currently doing $800,000 worth of freight business in this port each year, these are hardly topics to be dismissed as matters of a technical nature only.

I think a hearing in relation to the supplemental applications referred to above should have been held—and now must be. As I have indicated, I believe this holding is demanded by statute and applicable case law. But if this were not so, I would still believe this hearing to be required in the fact situation I have outlined as a matter of fundamental fairness mandated by the due process clause of the fifth amendment.

The hearing should be limited precisely to evidence bearing directly upon the technical requirements and fairness of the operating plan within the Port District and the charges necessary to support this service. By this language I mean specifically to exclude rehearing of the basic convenience and necessity issues as to multiple rail service up to the Port District.

I appreciate that there is some inconsistency between the expressed view of the I.C.C. that these problems should be handled as a whole and my requirement of a limited hearing on the supplemental applications. Actually, there is inconsistency implicit also in the I.C.C.'s own order requiring supplemental applications and supplemental orders. This is, however, a problem of size and complexity with many ramifications. As to most of its phases (and as to all of its most important phases) there has been a thorough hearing and fair consideration. I find no logic which requires, or statutory mandate or due process lack which commands, that this all be done over again.

The report and orders of the I.C.C. of October 5, 1959, are held to be amply supported by this record, and as to them the relief sought should be denied.

The supplemental orders of the I.C.C. dated September 19, 1960, August 23, 1962, and November 26, 1962, should be vacated and the case remanded for proceedings consistent with this opinion.

