## CHESAPEAKE & OHIO RAILWAY COMPANY v. UNITED STATES ET AL.

No. 73.  Argued January 26, 27, 1931.—Decided March 9, 1931.

*Mr. Robert B. Tunstall,* with whom *Messers. Herbert Fitzpatrick* and *Thomas L. Preston* were on the brief, for appellant.

*Mr. Nelson Thomas,* with whom *Solicitor General Thacher* and *Mr. Daniel W. Knowlton* were on the brief,

for the United States and Interstate Commerce Commission.

*Mr. John H. Holt,* with whom *Messrs. Robert E. McCabe, D. Lynch Younger,* and *Theodore W. Reath* were on the brief, for the Guyandot & Tug River Railroad Co. and the Norfolk & Western Railway Co.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This suit was brought by the appellant, for brevity called the Chesapeake, under the Urgent Deficiencies Act, 28 U. S. C., § 47, against the United States, the Guyandot and Tug River Railroad Company and the Norfolk and Western Railway Company. The former is a subsidiary of the latter and both may be called the Norfolk. The Interstate Commerce Commission appeared as a defendant. 28 U. S. C., § 45a. The purpose of the suit was to set aside and annul so much of an order and certificate of the Commission entered and issued July 23, 1928 (145 I. C. C. 167, 188, 193) and so much of subsequent orders in the same proceeding, as authorize the Norfolk to construct and operate a line of railroad in West Virginia from Gilbert about 10½ miles to Wharncliffe. The case was tried before three judges. A condensed statement of the evidence and exhibits before the Commission was submitted to the court. After hearing argument for the respective parties, the court entered its decree denying plaintiff any relief and dismissing the bill. 35 F. (2d) 769.

May 7, 1925, the Chesapeake filed its application for a certificate that the present and future public convenience and necessity require the construction by it of an extension of its Logan subdivision from Gilbert easterly 47.3 miles to Mullens and an extension of its Winding Gulf line from Stone Coal westerly 8.2 miles to Mullens. On October 29,

1925, the Guyandot company filed its application for a similar certificate for the construction of a line of railroad extending from a connection with the Virginian Railway at Elmore westerly 53 miles to Wharncliffe. The Norfolk and the Virginian joined in this application. An amended application was filed December 24, 1925, by the Guyandot which was joined in by the Norfolk alone. January 21, 1927, the Virginian and Western Railway, a subsidiary of the Virginian Railway Company—both may be referred to as the Virginian—filed its application for a like certificate for the construction of a line extending from a connection with the Guyandot branch of the Virginian at Ittman down that river 40.6 miles to a connection with the Chesapeake at Gilbert. This application was joined in by the Virginian Railway Company.

The locations of all the proposed lines between Gilbert and Mullens, Elmore or Ittman were in the narrow valley traversed by the Guyandot river. Authority to build the line between Gilbert and Wharncliffe was sought only by the Norfolk. The three applications were considered at the same hearing. The Virginian supported the Norfolk's application for the Gilbert-Wharncliffe connection. The Chesapeake opposed. All the applications were disposed of by the same report and order.

The Commission granted to the Virginian permission to construct its line in the Guyandot valley from Ittman to Gilbert and to the Norfolk leave to build between Gilbert and Wharncliffe. It denied the rest of the application of the Norfolk and that of the Chesapeake *in toto*.

The appellant seeks reversal upon the claim that neither the findings of the Commission nor the evidence affords any support for the order and that the record shows the construction of the proposed line between Gilbert and Wharncliffe to be contrary to the public interest and to have been authorized under an erroneous theory of the applicable law. It says that the only finding of the Com-

38

mission that supports the order is that the construction of the line will enable the Norfolk to compete with the Chesapeake for westbound traffic moving over the Virginian from the Guyandot valley and will assure the coal operators on the Virginian competitive service to the west. And it maintains that the Commission is not authorized by the Act to grant a certificate of public convenience and necessity for new construction upon a naked finding that competition between carriers and competitive service to shippers will result.

The situation, as disclosed by the report and the undisputed evidence, is as follows:

That part of West Virginia which is south of the Kanawha and New rivers contains vast deposits of coal and has many mines in operation. The Chesapeake, the Norfolk and the Virginian are the only railroads of importance in the district. The eastern terminus of the Chesapeake is at Newport News. It serves mines immediately south of these rivers. It has lines extending to the west where it has connections at Cincinnati, Columbus, Chicago and elsewhere on the Great Lakes. The eastern termini of the other carriers are at Norfolk. The lines of the Norfolk through the coal district are in the valleys of the Tug and Big Sandy considerably to the south of the lines of the Chesapeake and separated from them by a range of mountains extending from near Matoaka 150 miles or more northwesterly where it ends not far from Huntington on the Ohio. The Norfolk's main line crosses that of the Chesapeake at Kenova on the south side of the Ohio some distance below Huntington and extends to the west where it has connections at Cincinnati and Columbus. The Virginian has main and branch lines in the easterly part of these coal fields but it has no line to the west. It connects with the Chesapeake at Deepwater, a station on the Kanawha, and with the Norfolk at Matoaka which is a little over the divide south of the valley of the Guyandot.

These railroads have long been competing carriers of coal from that district. The tonnage controlled by the Virginian is about one-seventh of that of the Norfolk and that of the latter is about 60 per cent. of that of the Chesapeake. In 1927, 47 coal mines were served by the Virginian alone. These are called local mines. And 55 were served by it and also by the Chesapeake. These are called joint mines. Such local and joint mines during the first nine months of that year produced·and shipped coal via the Virginian at the rate of more than 12,000,000 tons per annum. And in that period the Virginian handed over to the Chesapeake at Deepwater and to the Norfolk at Matoaka coal for transportation to the west at the rate of more than 4,270,000 tons per annum, 80 per cent. of which moved via Matoaka.

Some years prior to the Virginian's application to build the proposed line the Commission required it to establish joint rates and through routes to the west via Deepwater, the Chesapeake and its connections, and also via Matoaka, the Norfolk and its connections.* The orders in that case covered only rates from a few specific origins on the Virginian. But the Chesapeake and the Virginian voluntarily established joint rates via Deepwater from all local mines on the Virginian and from such of the joint mines as were located between destinations and a local mine. The Chesapeake refused to establish rates from joint mines which were not intermediate because that would operate to short-haul itself. Similar joint rates were voluntarily established by the Virginian and Norfolk via Matoaka from all local and joint mines served by the Virginian.

The Chesapeake and the Norfolk are active competitors for transportation of coal originating on the Virginian and destined to the west. The line of the Virginian between its principal coal territory and Deepwater crosses three

---

* Wyoming Coal Co. *v.* Virginian Ry. Co., 96 I. C. C. 359. 98 I. C. C. 488. *Virginian Railway Co.* v. *United States,* 272 U. S. 658.

summits with heavy adverse grades against the loaded movement and heavier ones against the return movement. The Virginian's line to Matoaka has heavier adverse grades against the loaded movement than on its line to Deepwater. And on that route difficult grades are encountered on the Norfolk.

The line to be built by the Virginian down the Guyandot will have substantially no grades adverse to western movement. The Logan, subdivision of the Chesapeake is a well-located low grade line along the lower stretches of that river, and it has capacity to handle efficiently all the west-bound traffic originating on the Virginian. The route to the west down the river to Gilbert and over the divide to Wharncliffe is 41 miles shorter than the route via Matoaka. The line to be built across the divide will have an adverse grade that will require doubling. But both of the proposed new routes will be better than either of the existing ones. The Chesapeake estimates that the cost per ton of handling coal over the new route via Gilbert and its Logan subdivision will be 1.69 cents per ton less than the cost via the Gilbert-Wharncliffe route. The Norfolk estimates that cost via the latter will be 14 cents per ton less than via the present Matoaka route. The Norfolk through a subsidiary controls large deposits of coal in the valley tributary to the new line of the Virginian. And there is a considerable deposit of coal that may be made tributary to the proposed Gilbert-Wharncliffe line.

There is need for a line to connect the railways on the upper Guyandot with the Logan subdivision of the Chesapeake in the lower valley. Its main functions will be to provide a suitable outlet for westbound traffic, chiefly coal, from the lines of the Virginian and the Chesapeake in the upper valley and to carry the large tonnage of coal and lumber that may be developed tributary to the new line. The construction of the Gilbert-Wharn-

cliffe line will enable the Norfolk to compete with the Chesapeake for westbound traffic originating on the Virginian and will give the latter greater independence in respect of such shipments.

The construction of the line of the Virginian from the upper Guyandot to a connection with the Chesapeake at Gilbert would immensely improve the position of the latter in respect of the westbound movement of coal originating on the Virginian. It is also plain, indeed so obvious as scarcely to require statement, that the construction of the Gilbert-Wharncliffe connection is necessary in order to enable the Norfolk to continue, on conditions that are tolerable, to compete with the Chesapeake for that traffic. The construction of that connection cannot reasonably be regarded as an intrusion by the Norfolk into territory already being well-served by the Chesapeake. On the contrary the Norfolk already hauls about four-fifths of the Virginian's westbound coal. By this relatively short connection, it will be able to give a better outlet for that traffic, to make substantial saving in the cost of handling, and to remain in position, at relatively slight disadvantage, to compete for traffic in which it long has had a large share. And shippers will have the benefit of such competitive service.

But the Chesapeake insists that under the Transportation Act the Commission may not authorize new construction for the purpose of continuing such competition.

The Act cannot reasonably be so construed.

Section 1 (18) provides (Tit. 49, U. S. C.):

" No carrier by railroad . . . shall undertake the extension of its line of railroad, or the construction of a new line of railroad, . . . unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the . . . construction and operation, of such additional or extended line of railroad. . . ."

Section 1 (20) provides:

" The commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion . . . of a line of railroad, or extension thereof, described in the application . . . and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. . . ."

There is no specification of the considerations by which the Commission is to be governed in determining whether the public convenience and necessity require the proposed construction. Under the Act it was the duty of the Commission to find the facts and, in the exercise of a reasonable judgment, to determine that question. *Texas & Pac. Ry. Co.* v. *Gulf, C. & S. F. Ry.*, 270 U. S. 266, 273.

Undoubtedly the purpose of these provisions is to enable the Commission, in the interest of the public, to prevent improvident and unnecessary expenditures for the construction and operation of lines not needed to insure adequate service. In the absence of a plain declaration to that effect, it would be unreasonable to hold that Congress did not intend to empower the Commission to authorize construction of new lines to provide for shippers such competing service as it should find to be convenient or necessary in the public interest. Indeed § 5 (4) of the Act, authorizing the Commission to adopt a plan for the consolidation of railway properties into a limited number of systems, clearly discloses a policy on the part of Congress to preserve competition among carriers. It provides: " In the division of such railways into such systems under such plan, competition shall be preserved as fully as possible and wherever practicable the existing routes and channels of trade and commerce shall be maintained." And the Commission has recognized the advantages of competitive service to shippers especially in respect of a

diversified car supply for the shipment of coal and lumber; it suggests the possibility of failure of operation from various causes, that under some circumstances competition operates to stimulate better service and that reasonable competition may be in the public interest. Construction of Lines in Eastern Oregon, 111 I. C. C. 3, 37. Construction of Line by Wenatchee Southern Ry., 90 I. C. C. 237, 257.

The facts stated in the report are sustained by the evidence and, under the Act, they are plainly sufficient to support the order.

*Judgment affirmed.*