**UNION PAC. R. CO. v. DENVER & RIO GRANDE WESTERN R. CO.**

No. 4427.

United States Court of Appeals
Tenth Circuit.

July 18, 1952.

A. U. Miner, Salt Lake City, Utah (Bryan P. Leverich and M. J. Bronson, Salt Lake City, Utah, on the brief), for appellant.

W. Q. Van Cott, Salt Lake City, Utah (S. N. Cornwall and Dennis McCarthy, Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Section 1, paragraph (18) of the Transportation Act of 1920 forbids a carrier by railroad subject to the Act to undertake the extension of its line of railroad without first obtaining from the Interstate Commerce Commission a certificate of convenience and necessity; paragraph (20) empowers a court of competent jurisdiction at the suit of a party in interest to enjoin any construction contrary to the provisions of paragraph (18); and paragraph (22) provides among other things that the authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction of spur or industrial tracks, located or to be located wholly within one state. 41 Stat. 477–478, 49 U.S.C.A. § 1(18) (20) (22).

The Denver and Rio Grande Western Railroad Company, hereinafter referred to as Rio Grande, and Union Pacific Railroad Company, hereinafter referred to as Union Pacific, are railroad companies engaged as common carriers of passengers and freight in interstate commerce, and each operates a line of railroad in Salt Lake City, Utah. Union Pacific leases part of the property constituting its system, including that in Salt Lake City, but that fact has no present materiality and therefore reference will be made to such property as though it belonged to Union Pacific. The main line of Rio Grande in Salt Lake City extends southerly along Fourth West Street to Ninth South Street; at Ninth South it angles to the west to Fifth West Street; and it then proceeds southerly along the line of Fifth West Street toward Provo, Utah. The main line of the Provo Subdivision, as operated by Union Pacific, extends southerly along Third West Street between Second South and Ninth South; at Ninth South it angles to the east crosses Second West Street, strikes First West Street at a point between Eleventh and Twelfth South Streets; and then proceeds southerly along First West Street toward Provo. Rio Grande also owns and operates the Rio Grande-Bamberger interchange track which leaves the main line of Rio Grande at a point south of Seventeenth South Street, angles to the northeast, crosses the main line of Union Pacific at a point south of Thirteenth South Street, and then connects with the Bamberger electric railroad. There is an area between Ninth and Twenty-first South Streets, and between Second and Fourth West Streets, commonly referred to throughout this proceeding as the industrial area. It contains approximately two hundred and sixty-five acres and is located about one and one-half miles from the business center of Salt Lake City. Desiring to construct a track from a point on its main line southerly along Third West Street as existing and extended to Twenty-first South Street, Union Pacific obtained from the City Commission of Salt Lake City a franchise and from the Public Service Commission of Utah a permit. Denver & Rio Grande Western Railroad Co. v. Public Service Commission, Utah, 230 P. 2d 557. But it did not obtain from the Interstate Commerce Commission a certificate of convenience and necessity. Later Oregon Short Line Railroad Company, lessor of its line to Union Pacific, instituted and successfully maintained an action against Rio Grande to condemn a right-of-way across the tracks of the latter. Oregon Short Line Railroad Co. v. Denver & Rio Grande Western Railroad Co., Utah, 237 P.2d 829. Union Pacific commenced the construction of the track, referred to throughout this proceeding as the industrial lead track. It was to be approximately nine thousand feet in length and was to cross the interchange track owned and operated by Rio Grande as well as a spur track leading from such interchange track.

Rio Grande instituted this action against Union Pacific. The cause of action pleaded in the complaint was that since prior to 1890, the industrial area had been available for industrial development from the main line of Rio Grande; that since 1914, it had been available for such development from the interchange track; that it was not available to Union Pacific because it was infeasible to reach it from the main line of that company; that the industrial lead track would cost approximately $100,000; that it was unnecessary for public service; that it involved a waste of resources; that it would result in non-productive and in-

jurious competition between the two companies; that it would cause damage and injury to Rio Grande in excess of $500,000 and would result ultimately in injury to the public; that it constituted an extension of the line of railroad of Union Pacific, within the meaning of paragraph (18), supra; and that no certificate of convenience and necessity for its construction had been obtained. The prayer was that Union Pacific be enjoined from proceeding with the construction of the track unless and until a certificate of convenience and necessity should be obtained. Union Pacific admitted that no certificate of convenience and necessity had been obtained for the construction of the track; denied that the industrial area was available to Rio Grande for industrial purposes from its main line and from the interchange track; denied that the area was not available to Union Pacific for purposes of industrial development from its main line, but admitted that due to increased traffic on Second West Street it was not as feasible to reach and serve such area from the company's main line as it was to extend trackage down Third West Street; denied that the track being constructed was an extension; denied that it was unnecessary for public interest; denied that it involved a waste of resources; denied that it would result in non-productive and injurious competition; and denied that it would cause injury and damage to Rio Grande, or would result ultimately in injury to the public.

The court found among other things that the industrial area was not then developed with industrial trackage except certain spur tracks; that it was expected in the near future that industries would locate in the area and would require industrial trackage for delivery and shipment of carload freight traffic; that the two railroad companies were in keen competition with each other in Salt Lake City for traffic in interstate commerce; that the industrial area was available for industrial development by Rio Grande by means of spur tracks extending from its main line and from its interchange track; that it was not available to Union Pacific for such industrial development by means of spur tracks extending from its main line, it not being feasible to reach such area by crossing Second West Street; that it was the intention of Union Pacific to extend the industrial lead track from Ninth South Street to Twenty-first South Street for the purpose of developing the area by inducing industries to locate and build therein and to receive railroad freight carload service of Union Pacific by the construction of spur tracks from the industrial lead track to such industries; that the industrial area constituted potentially and in the near future one of the richest industrial traffic producing areas in Utah; that the building of the industrial lead track and the development of the area in the manner proposed by Union Pacific would result in traffic being diverted from Rio Grande to Union Pacific with substantial losses to Rio Grande from freight revenues; and that the track when completed would cost approximately $62,000. And it was further found that Union Pacific did not then contemplate having any freight stations, loading stations, or station agents within the industrial area; that it did not propose to operate trains therein under train orders; that it did not contemplate furnishing any passenger service, express service, or mail service therein; and that it intended merely to furnish a switching service within the switching limits to such industries as had spur tracks connected to the industrial lead track. The court concluded that the industrial lead track as proposed to be built constituted an extension within the meaning of paragraph (18) of section 1 of the Transportation Act; and that it did not constitute a spur, industrial, team, switching, or side track, within the meaning of paragraph (22) of the Act. Judgment was entered enjoining Union Pacific from proceeding with the further construction of the track unless and until a certificate of convenience and necessity was obtained; and the appeal is from such judgment.

Error is assigned upon the action of the court in excluding evidence tending to show that in 1941 Rio Grande constructed and subsequently operated a track from its main line to the then Remington Arms plant, without first obtaining a certificate of

convenience and necessity; and that in 1946 it purchased and thereafter operated the interchange track, without first obtaining such a certificate of convenience and necessity. The pleadings were silent in respect to any issue of that kind. Nothing was said at the pretrial conference concerning such an issue. The pretrial order, apparently prepared with the unqualified consent of the attorneys for both parties, stated specifically that the issue of fact and law was whether the proposed trackage constituted an extension, or a spur, industrial, team, switching or side track, within the meaning of the statute. No mention was made in the order of the construction and operation of the track to the Remington Arms plant, or the purchase and operation of the interchange track, without first obtaining a certificate of convenience and necessity. Manifestly, the tendered evidence was outside and beyond the issues joined in the case. Moreover, whether Rio Grande constructed and operated the track to the arms plant and purchased and operated the interchange track without obtaining a certificate of convenience and necessity bore no relevancy or materiality whatever to the question whether the industrial lead track being constructed by Union Pacific constituted an extension, within the meaning of the Transportation Act. For these reasons, the tendered evidence was properly excluded.

Complaint is made that the court erred in excluding other evidence offered upon the trial. It would not serve any useful purpose to discuss the tendered evidence, item by item. It is enough to say that the trial was before the court without a jury, and that no prejudicial error appears in connection with the admission or exclusion of evidence.

Criticism is directed to the finding of the court that the industrial area was not then available for industrial development by Union Pacific except by the construction of the industrial lead track, it being not feasible to reach the area by crossing Second West Street. It is said that finding as worded was not a proper finding; that it begged the question; that it did not say that the area was not available to Union Pacific but that it was not available because it was infeasible to reach it from Second West Street. It is further said that the court could just as well have said that the area was not available to Union Pacific because the company did not want to cross Second West Street. But the contention is super critical. The intent and meaning of the finding is perfectly clear. Its substance was that due to existing physical conditions, it was not feasible for Union Pacific to project spur tracks from its main line across Second West Street and thence into the industrial area; and that therefore the area was not available to Union Pacific except by the construction of the industrial lead track with spurs leading from it to industries within the area. And viewed in that manner, the finding is not open to objection in respect to its wording or form.

The finding of the court that the building of the industrial lead track would if completed result in traffic being diverted from Rio Grande to Union Pacific is challenged. It is argued that nowhere in the pleadings or in the evidence was there any claim that traffic would be diverted in that manner. It was alleged in the complaint that the construction of the track would cause injury to Rio Grande in excess of $500,000. That was a general allegation, and under it evidence would have been admissible tending to show that the injury and damage would be in the form of diversion of traffic with resulting diminution in revenues. It may be that if appropriate steps had been seasonably taken, Rio Grande could have been required to make the allegation more specific by setting forth the nature of the injury and damage. But that was not done, and absent any effort in that direction evidence would have been admissible tending to show the diversion of traffic with loss of revenues as the result of the construction of the industrial lead track. At the pretrial conference attention was drawn to the allegation and the court inquired whether the parties desired to frame an issue upon it. In the course of the proceedings immediately preceding and following the inquiry, one of the attorneys for Union Pacific made statements which clearly constituted an admission that, while

it was not business which Rio Grande was then presently getting but was prospective business, within the reasonable future Rio Grande would lose half a million dollars. The admission plainly referred to revenue from prospective business which Rio Grande would obtain if the industrial lead track was not constructed and operated. A transcript of the proceedings at the pretrial conference was introduced in evidence on the trial of the case on its merits. The admission of the attorney for Union Pacific eliminated any need for the introduction of evidence tending to show that the building of the track in question would if completed result in traffic being diverted from Rio Grande to Union Pacific with resulting loss to the former and gain to the latter; and it adequately sustains the finding of the court.

The Transportation Act placed the railroad systems of the country more under the control of the Interstate Commerce Commission than they had previously been, with power vested in the Commission to supervise their rates for transportation in interstate commerce of passengers and freight, their issue of securities, their supply and distribution of cars, their joint use of terminals, their abandonment of existing tracks, and their construction of new lines. The underlying purpose of the provision contained in paragraph (18) of the Act forbidding the construction of an extension of an existing line without first obtaining a certificate of convenience and necessity was to prevent improvident and unnecessary expenditures for the construction and operation of lines not needed to insure adequate service; to protect interstate carriers from weakening themselves by constructing and operating superfluous lines, and to protect them from being weakened by another carrier operating in interstate commerce a competing line not required in the public interest; and to preserve well balanced competition among competing carriers, that being deemed in the public interest. Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578; Texas & New Orleans Railroad Co. v. Northside Belt Railway Co., 276 U.S. 475, 48 S.Ct.

361, 72 L.Ed. 661; Chesapeake & Ohio Railway Co. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824; Interstate Commerce Commission v. Oregon-Washington Railroad & Navigation Co., 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588. In the enactment of that particular provision, Congress acted in the considered belief that unbridled competition among carriers may not be compatible with public interest but may in some instances result in harm to the public. Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., supra.

■ The crucial question in the case is whether the trackage as proposed and partly constructed is an extension or an industrial track, within the intent and meaning of paragraph (18). The guiding principles to be followed in determining the question were enunciated in Texas & Pacific Railroad Co. v. Gulf, Colorado & Santa Fe Railway Co., supra. There a territory near Dallas, Texas, was known as the Industrial District. Cement works, oil refineries, and metal works were located within the area. All of the industries were either located on the right of way of Texas & Pacific or were reached by spurs from the main line of the company. To serve the plants the company operated long switches and assembling tracks. No other railroad had any direct contact with any of the industries. Their traffic from or destined to other lines was interchanged by Texas & Pacific at points on its line from twelve to thirty miles distant from such industries. And in that manner, Texas & Pacific received either the whole or a part of the revenue on all the traffic of the district which was then the richest freight-producing territory in Texas. The Santa Fe proposed to construct trackage from Hale, a station on its line, into the industrial district near the right of way of Texas & Pacific, without having obtained a certificate of convenience and necessity. The airline distance from Hale to the proposed terminus was only three and one-half miles; but the length of the track was seven and one-half miles, besides spurs, sidings, and other subsidiary tracks. The cost of the construction was estimated at $510,000, and the freight revenues which the Santa Fe would

thus divert from the Texas & Pacific were estimated at more than $500,000 per year. According to the plan, there would be no public station along the track for the receipt or delivery of freight, and no telegraph, express, mail, or passenger service. The transportation would be confined to carload freight; and it would be conducted as a switching service for which no charge would be made, the Hale rate being applied to all traffic on the projected line. In support of its contention that the proposed line constituted an industrial track within the meaning of paragraph (22), the Santa Fe argued that an industrial track is one constructed to serve or reach industries over which regular scheduled passenger or freight train service is not performed and for transportation for which only a switching charge, if any, is made; and that neither the length nor the character of the construction can convert a line of that nature into an extension. The court said that spurs or industrial tracks are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory are similarly situated and entitled to like service from the carrier; and that the expenditure involved is ordinarily small. The court further said that where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are of national concern; that the invasion through new construction of territory already adequately served by another carrier may be inimical to the national interest; and that if the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension, within the meaning of paragraph (18), even though the line be short and the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. And drawing that distinction between an industrial track and an extension, the court held that the proposed track there involved constituted an extension. In Missouri, Kansas & Texas Railroad Co. v. Texas & New Orleans Railroad Co., 5 Cir., 172 F.2d 768, it was held that the trackage contemplated did not constitute an extension, within the meaning of paragraph (18). But there a competitive condition already existed between the two companies, and by the construction of the proposed trackage one of them desired to improve its position and in that manner further intensify the competition. Here, the heart of the industrial area lies between Second and Fourth West Streets. Rio Grande is serving industries within the area by means of spur tracks extending from its main line and from its interchange track. And that company is in position to serve adequately by like means other industries which may come into the area as further development occurs. But industries between Second and Fourth West Streets are not presently reached and served by Union Pacific. It does not have spurs extending from its main line across Second West Street and thence into the area. And it does not reach industries within the area by other trackage. So far as that company is concerned, the proposed trackage will invade new territory not previously or presently served by it; and it will result in loss of revenue to a competing line which is furnishing adequate service to industries already in the area and is prepared to supply like facilities to other industries which may come into the area in the future. The proposed track is an extension, within the meaning of paragraph (18); and its construction is forbidden unless and until a certificate of convenience and necessity has been obtained. Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., supra; and see Missouri Pacific Railroad Co. v. Chicago, Rock Island & Pacific Railroad Co., 8 Cir., 41 F.2d 188, certiorari denied 282 U.S. 866, 51 S.Ct. 74, 75 L.Ed. 765; Missouri Pacific Railroad Co. v. St. Louis Southwestern Railway Co., 8 Cir., 73 F.2d 21.

The judgment is affirmed.