**STATE OF VERMONT**

v.

**BOSTON AND MAINE CORPORATION and United States of America.**

Interstate Commerce Commission, the City of New York, the City of Montreal, the Canadian Corporation for the 1967 World Exhibition, the Vermont Public Service Board, and the Brotherhood of Railroad Clerks, the Brotherhood of Railroad Trainmen, the Brotherhood of Firemen and Engineers, and other unions and employees, by C. N. Monaghan, Intervenors.

**Civ. No. 4799.**

United States District Court
D. Vermont.
May 11, 1967.

Chester S. Ketcham of Underwood, Lynch & Ketcham, Middlebury, Vt., for State of Vermont and Vermont Public Service Board.

Hilton H. Dier, Jr., Deputy Atty. Gen., for State of Vermont, Montpelier, Vt., for plaintiff.

John N. Nassikas, of Wiggin, Nourie, Sundeen, Nassikas & Pingree, Manches-ter, N. H., Black & Plante, White River Junction, Vt., for Boston & Maine Corp.

Joseph P. Radigan, U. S. Atty., Dist. of Vermont, Rutland, Vt., for the United States.

Jerome Nelson, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

David W. Smith, New York City, for City of New York.

Jean Montplaisir, of Page, Mercier & Beauregard, Montreal, Canada, for City of Montreal.

Paul Buisson, Montreal, Canada, for 1967 World Exhibition.

Carleton N. Monaghan, St. Albans, Vt., pro se and for Brotherhood Unions.

Before WATERMAN and SMITH, Circuit Judges, and LEDDY, District Judge.

J. JOSEPH SMITH, Circuit Judge.

The State of Vermont brought this action appealing from and seeking to enjoin and set aside, or to remand for further consideration, a Report and Order of the Interstate Commerce Commission entered January 25, 1967 in Finance Docket No. 24000, Boston and Maine Corp. Discontinuance of Trains, 328 I.C. C. 594, permitting discontinuance of four passenger trains, between Springfield, Massachusetts and White River Junction, Vermont, the Boston and Maine operated segment of a through Montreal-New York City run, and the sole remaining rail passenger service between Springfield and White River.

The proceedings in this case commenced with a notice and supporting statement of a proposal to discontinue these trains effective March 7, 1966, filed on February 1, 1966, pursuant to Section 13a(1) [1] of the Interstate Com-

---

1. § 13a. Discontinuance or change of the operation or service of trains or ferries; notice; investigation; hearing; determination

(1) A carrier or carriers subject to this chapter, if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State or in the District of Columbia, or from a point in the District of Columbia to a point in any State, are subject to any provision of the constitution

merce Act. By order of February 21, 1966, the Commission instituted an investigation of the proposed discontinuance, ordering the trains continued meanwhile. The proceeding was heard on a consolidated record with Finance Docket Nos. 23959, 23960 and 23961, which involved discontinuance of Boston and Maine trains between Boston, Massachusetts and various points in Massachusetts and New Hampshire. Hearings were held and briefs were filed with Division 3, which on July 6, 1966 found that continuance was not required by present and future convenience and necessity and that continued operation would unduly burden interstate or foreign commerce. Findings and report were filed July 22, 1966, 328 I.C.C. 224. Action was brought by the Public Service Board of the State of Vermont, Civil Action 4611, District of Vermont, seeking to set aside and enjoin enforcement of the order. A temporary restraining order was issued by Judge Gibson on July 8, 1966. A three-judge district court was convened, and after hearing, dissolved the restraining order and denied injunctive relief on the ground that there had been insufficient showing of irreparable injury, Circuit Judge Waterman dissenting. The trains were discontinued September 4, 1966.

Vermont and others petitioned the Commission for further hearing and reconsideration. The Commission recalled the matter from Division 3 and reconsidered it. On reconsideration by the full Commission the findings in the report of July 22, 1966 were affirmed, Chairman Tucker dissenting. 328 I.C.C. 594, January 25, 1967. This action, Civil 4799, District of Vermont, followed and a second three-judge district court was convened.

The Interstate Commerce Commission, the City of New York, the City of Montreal, The Canadian Corporation for the

---

or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding. Upon the filing of such notice the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change. Upon the institution of such investigation, the Commission, by orders served upon the carrier or carriers affected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation, whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration of operation or service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order. The provisions of this paragraph shall not supersede the laws of any State or the orders or regulations of any administrative or regulatory body of any State applicable to such discontinuance or change unless notice as in this paragraph provided is filed with the Commission. On the expiration of an order by the Commission after such investigation requiring the continuance or restoration of operation or service, the jurisdiction of any State as to such discontinuance or change shall no longer be superseded unless the procedure provided by this paragraph shall again be invoked by the carrier or carriers.

1967 World Exhibition, The Vermont Public Service Board, and The Brotherhood of Railroad Clerks, The Brotherhood of Railroad Trainmen, The Brotherhood of Firemen and Engineers, and other unions and employees, by C. N. Monaghan, were permitted to intervene in the action.

The Boston and Maine Corporation moved to dismiss the action for lack of jurisdiction.

The Court finds that it has jurisdiction over the parties and subject matter of the action, denies the motion to dismiss, and affirms the order of the Interstate Commerce Commission. The application for injunctive relief requiring resumption of operation of the trains is denied.

It has been held that there is no court review authorized of determinations under 13a (1) not to enter into investigations of a proposed discontinuance of service, or of determinations after investigation and hearing refusing to order continuance. State of New Jersey v. United States, D.C., 168 F.Supp. 324, aff'd p. c. Bergen County v. United States, 359 U.S. 27, 79 S.Ct. 603, 3 L. Ed.2d 625 (1959); State of New Hampshire v. Boston and Maine Corporation, 251 F.Supp. 421 (D.N.H.1965). The Commission takes the position that a state may obtain review of an order entered after a hearing, which allows the discontinuance to take effect, but has requested an amendment of the Act to remove any doubt on the point, as well as to lengthen the time for the Commission to act, and broaden its powers.[2]

We agree with our brethren in the *New Hampshire* case, 251 F.Supp. 421

**2.** See justification submitted with a proposed bill to the Senate Commerce Committee. H.Res. 7004, Senate 1175, 90th Congress, 1st Session.

"In the years since section 13a was enacted in 1958, it has become evident that the statute contains deficiencies and requires amendment. This amendment is proposed as the result of our experience in more than 200 train-discontinuance proceedings, and the criticism voiced by members of Congress, State officials, and others concerned with those proceedings.

"The rail passenger problems are still with us—the patronage trend, for example, is downward, while operating costs continue their inexorable rise. In fact, the trend has been spurred most recently by the Post Office Department's policy of transferring the mail from rail to highway, thereby depriving many passenger trains of their primary sustenance and converting formerly profitable or marginal operations into clear-cut candidates for discontinuance.

"Added to that are the announcements made in the press that various railroads intend to continue the pursuit of section 13a relief from certain passenger obligations Some roads apparently contemplate major revisions in their passenger systems.

"While present procedures are substantially adequate for most discontinuance cases, we feel they would be strained by certain kinds of important or exceptional cases. In such cases, particularly where the train or trains serve an extensive route with several large cities or where a system of trains is involved, a period of more than four months could well be needed in affording the people the full opportunity for hearing to which we believe they are entitled. We believe that, in the more important cases, state agencies and interested members of the public would need more time to prepare for hearing and to analyze the carrier proposals—some of which are voluminous and complex. More time is needed in the hearings themselves, in analyzing the record, digesting the pleadings, and preparing our decisional report.

"Under our proposal the Commission would be empowered to require the continuance of service unchanged for a period up to seven months rather than four. While many cases in the future, as in the past, can certainly be disposed of within four months, we want to be prepared for those cases that require additional time. Our bill also provides for an additional period up to two months, if needed, for completing the investigation and dealing with administrative appeals.

"To further facilitate the investigation, the burden of proof, under the bill, is specifically assigned to the carrier, since that is the party possessing most of the material data. This assignment, in addition, would impel the carrier to make a more

at 424, that the thrust of the 1958 statute amending the Interstate Commerce Act, which became section 13a, was relief of hard pressed roads from heavy losses from passenger service operations, abandonment of which state commissions were unduly reluctant to sanction, by giving the roads the option of having the Interstate Commerce Commission rather than the state bodies, pass upon discontinuance of interstate operations. See, as to 13a (2) intrastate discontinuances, Southern RR Co. v. North Carolina, 376 U.S. 93, 104, 84 S.Ct. 564, 11 L.Ed.2d 541 (1964). But we fail to find convincing evidence that the Congress intended the unusual and concededly unfair result of granting judicial review of the Commission's determination solely to the roads, and not to opposing parties. The statutory scheme gives the Commission power to control discontinuances, and sets limits on the Commission's powers, allowing discontinuances to become effective unless the Commission acts within four months and empowering it to require continuance of service only for a period of one year after the date of the order, after which period the carrier could again move for relief under the statute.

If an order is wrongfully granted, the road can obtain review and reversal. If an order is wrongfully refused, ordinary principles of review of administrative determinations, as well as elemental fairness call for review at the instance of opposing parties. Congress having set standards for the Commission in the Act, its decision to refuse to order continuance as well as its decision to order it, should be reviewable and we have jurisdiction to do so here. Compare the Administrative Procedure Act, 60 Stat. 237 (1946), 5 U.S.C. § 1009. Cf. Bard, The Challenge of Rail Passenger Service, Regulation, and Subsidy, 34 Univ. of Chi.L.R. 301, 311 n. 28 (1967); United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162 (1939); Rochester Telephone Co. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).

We must determine whether substantial evidence supports the findings, and whether proper standards were applied. Bard points out, op. cit. supra, p. 322, that the Commission in 13a (1) cases in which it has declined to interfere with discontinuances has so far found both undue burden and that the service was not required by public convenience and necessity.[3] Although the difference in

---

complete initial presentation, leaving less supplementation to be done after the hearings begin.

"To better deal with situations where practical or temporary solutions might lie along lines other than a mere approval or denial of the carrier's proposal, we are requesting authority to render decisions on a conditional basis, i. e., contingent upon modifications in factors affecting service or operations. This would open up avenues thus far untried toward arresting the decline of the passenger train.

"Included is a new provision making it clear that court appeal will lie as to Commission decisions affecting the outcome of a carrier's discontinuance proposal, whether the discontinuance is permitted or not. Under the present law, as interpreted by the courts, judicial review is available only in those cases in which the Commission requires the continuance of the train or ferry service in question. Although the Commission has consistently taken the position that a decision per-

mitting a railroad to discontinue service should be appealable by a State or any other adversely affected party, certain United States District Courts have held otherwise. We believe that this matter should be clarified by Congress through enactment of our proposed section 13a (3). This new section would permit any adversely affected party, including a State, State regulatory commissions, or other persons, to appeal an administratively final action of this Commission which is determinative of a discontinuance proposal in the same manner now available to the carriers. All decisions of the Commission would be appealable except decisions not to investigate a proposed discontinuance.

"The bill employs the same sound and adequate substantive tests as those in the present section 13a, and follows generally along the same procedural lines."

3. Citing N.Y., N.H. & H. R.R. Discontinuance, 327 I.C.C. 151, 255 (1966);

language between 13a (1) and 13a (2) suggests, as does Bard, that Congress intended separate standards, and that in case of interstate operations either a finding of undue burden or that the service was not required by public convenience and necessity would support a refusal by the Commission to interfere with the abandonment, the Court in a 13a (2) case, Southern RR Co. v. North Carolina, supra, has declared that the standards are the same.

The question is, however, academic here since both findings are made, and in any case, as a practical matter, factors affecting undue burden must also be weighed in determining whether service is required by public convenience and necessity and vice versa.

On the first branch of its findings, on public convenience and necessity, the Commission relied on the evidence of the inconsiderable number of passengers using the trains, particularly of those boarding or leaving the trains at the stations served by the Boston and Maine segment of the run, on the availability of adequate and more rapid rail service between Montreal and New York by the Delaware and Hudson and New York Central through New York State, and adequate, although less convenient, passenger service to the area served by these trains by bus, plane and private car. It based its finding on undue burden on interstate commerce on the precarious financial position of the Boston and Maine and on a determination that substantial cash savings would result from discontinuance of the service.

The amount of passenger traffic on these trains and its downward trend are outlined in the Report of the Commission, Division 3, pp. 230–231:

| "Train | Year | Mon–Fri | Saturday | Sunday | Daily |
|--------|------|---------|----------|--------|-------|
| 21 | 1963 | 76 | 80 | 79 | 77 |
|    | 1965 | 66 | 96 | 61 | 70 |
| 20 | 1963 | 83 | 123 | 73 | 87 |
|    | 1965 | 71 | 92 | 84 | 76 |
| 75 | 1963 | 67 | 82 | 85 | 72 |
|    | 1965 | 57 | 70 | 66 | 60 |
| 76 | 1963 | 49 | 51 | 138 | 62 |
|    | 1965 | 46 | 46 | 94 | 53 |

"Those figures demonstrate that, on a daily average basis, the percentage of passenger attrition in 1965 from 1963 patronage has been: 9.1 percent on train 21; 12.6 percent on train 20; 16.7 percent on train 75; 14.5 percent on train 76; 10.9 percent on trains 20 and 21; 15.6 percent on trains 75 and 76; and 13.1 on the 4-train Connecticut Valley service.

"The record also demonstrates that passenger service performed by the trains is predominantly overhead or interline, and that relatively few passengers traveled to or between points on the Boston and Maine railroad. Detailed passenger averages, compiled from the audits, establish that of the passengers on train 76 between White River Junction and Springfield, approximately 73 percent had boarded north of White River Junction where the train was delivered to Boston & Maine, and that approximately 75 percent remained on the train beyond Springfield where carrier delivered the

Atchison T. & S.F. Ry. Discontinuance, 312 I.C.C. 79 (1960); Chicago & N.W. Ry. Discontinuance, 307 I.C.C. 463 (1959); Minneapolis & St. L. Ry. Discontinuance, 307 I.C.C. 79 (1959); Great No. Ry. Discontinuance, 307 I.C.C. 59 (1959).

train to the New Haven. Percentages for the other three trains are not substantially different."

The findings as to alternate service are as follows:

"*Alternate service.* The entire service area of the involved trains, and of the connecting carriers, has an adequate to excellent all-weather highway system serving all involved stations. Private automobile registrations and private automobile travel on the highways have been increasing rapidly in this area as they have generally throughout the country. On the other hand, the stations served are contributing an average of 1 railroad passenger per day to the Boston & Maine trains for each 2,000 to 5,000, or more, of population.

"The overhead passengers between New York and Montreal will continue to have at least equal passenger train service on 2 daily trains in each direction in the joint passenger service of Delaware & Hudson Railroad and New York Central Railroad. The schedule time on those trains is approximately 2 hours less than that of Boston & Maine trains. Since the Pennsylvania Railroad passengers on its connecting trains between Washington and New York City make their connections at New York City, those passengers will have the same service available. Air Canada provides 6 daily northbound flights and 1 daily northbound flight, except Sunday, from New York to Montreal; and operates 6 daily southbound flights, and 1 daily southbound flight, except Saturday, from Montreal to New York. There are 2 daily through bus schedules in each direction between Montreal and New York City. Metropolitan area passengers to the Green Mountain recreation area are served by 4 daily through trips in each direction between Burlington, Vt., and New York City; by 2 daily trips in each direction between the same points requiring a transfer at Albany, N. Y.; and by additional schedules operated between the same points on weekends. Metropolitan area passengers to the Green Mountain recreation area are also served by 1 daily Northeast Airlines flight in each direction between New York City and Montpelier; and to the White River Junction-Hanover recreation area by the following flights between Lebanon and New York City: 2 daily in each direction; 1 daily, except Saturday, in each direction; 1 northbound on Friday and Sunday only; 1 southbound daily, except Saturday; and 1 southbound on Friday, Saturday, and Sunday only.

"The bus schedules described above operate via Rutland, Vt., and Albany, N. Y. In addition there are southbound schedules between New York City and Burlington, via Springfield, as follows: 2 daily through schedules; 2 daily schedules involving a transfer at White River Junction; 1 Sunday only through schedule; and 1 schedule, Friday and Sunday only, from White River Junction to New York City. There are 3 daily connecting schedules southbound from Montreal to Burlington. The northbound bus schedules between New York City and Burlington via Springfield are: 2 daily through schedules; 2 daily schedules with a change of bus at White River Junction; added trips on Friday and Sunday; and 1 schedule terminating at White River Junction. There are 3 daily connecting schedules at Burlington for Montreal.

"The bus schedules via Springfield parallel the route of the 4 trains and provide from 2 to 4 regular daily stops at all Vermont points served by the involved trains, and a limited number of stops at intermediate Massachusetts stations. However, those stations have an extensive commuter bus service provided by the Springfield Street Railway and Peter Pan Bus Lines, and substantial bus service east, south and west of Springfield. The Massachusetts stations contributed a daily average of less than 15 passengers to carrier's trains and 10 of those passengers

were Springfield passengers. Springfield will continue to have substantial New Haven and New York Central passenger service.

"No doubt some of the Massachusetts and Vermont passengers will suffer some expense and inconvenience in adjusting to the alternate service. It has already been noted that those passengers constitute only about 25 percent of the total number carried by the trains. Most of the passengers who are overhead traffic in the Boston & Maine operation have multiple choices of alternate service, including passenger train service. Furthermore, passenger train service is available to most passengers who wish to travel by train to the Montreal Exposition in 1967."

The carrier's claims as to the financial results of the operation of the four trains, adopted in all major particulars by the Commission, are as follows:

| | 1965 | Est. 1966 |
|---|---|---|
| **Revenues** | | |
| Passenger | $437,525 | $437,525 |
| Mail | 121,936 | 122,450 |
| Express | 8,682 | 9,035 |
| Newspaper transp. | 4,020 | 4,020 |
| Joint facilities op. | 5,661 | 5,661 |
| Total Revenue | $577,824 | $578,691 |
| **Expenses** | | |
| Train and engine crew wages | $185,789 | $188,240 |
| Locomotive fuel | 44,695 | 44,695 |
| Locomotive maintenance | 101,509 | 108,332 |
| Locomotive supplies | 5,131 | 5,131 |
| Engine house expense | 36,646 | 39,587 |
| Train supplies | 29,815 | 31,726 |
| Foreign car hire | 87,411 | 87,411 |
| Pullman rental | 54,483 | 54,483 |
| Terminal and joint facility costs | | |
| White River Junction | 27,333 | 28,492 |
| Brattleboro Station | 20,833 | 21,813 |
| Windsor Station | 1,450 | 1,485 |
| Springfield Station | 70,950 | 72,039 |
| Springfield joint facility | 15,638 | 16,287 |
| Brattleboro to E. Northfield trackage | 4,305 | 4,305 |
| Car inspection costs, White River Jct. | 8,630 | 8,980 |
| Insurance costs equipment | 4,436 | 4,436 |
| Legal liability | 17,160 | 17,160 |
| Personal injury costs | 10,728 | 10,728 |
| Stationery and printing | 1,387 | 1,387 |
| Locomotive depreciation | 49,729 | 49,729 |
| Total Expense | $778,058 | $796,446 |
| Credit: Central Vermont reimbursements | | |
| Motive power expense | $ 8,715 | $ 8,715 |
| Car inspection | 22,947 | 23,729 |
| | 31,662 | 32,444 |
| Net total expense | $746,396 | $764,002 |
| Net (loss) | ($168,572) | ($185,311) |

The financial condition of the carrier was found to be as follows:

*"Financial condition.* The financial condition of carrier is serious. It has not made an overall profit since 1957. For the years 1958 through 1965 it has shown an overall deficit of more than $25 million. Accounted for in those results are a subsidy of $2,021,-032 received from the Mass Transportation Commission of Massachusetts in 1963, and the payment of $3,072,736 by Massachusetts Bay Transportation Authority for 1965 losses incurred in the operation of Boston commuter service. For more than 20 years passenger service has been a deficit operation. In 10 of the last 20 years that deficit was under $10 million per year, but in the other 10 years it ranged from $11.6 million to $15.2 million per year. During that same period of time net railway operating income from freight service revenues has declined seriously from a high of $19.9 million in 1951 to a low of $3.4 million in 1964. In 1945 it required 27.57 percent and in 1964 it required 96.47 percent of freight profits to cover passenger service deficits. Except for 1945, 1963, and 1965 that percentage exceeded 57 percent.

"Carrier's 1965 income statement shows a deficit of $577,785 after fixed charges and contingent interest. Net freight service operating income was $5,773,394 and net passenger service operating deficit was $533,318, requiring 9.24 percent of net railway operating income from freight service to subsidize the passenger deficit in 1965. Had carrier been operating the Boston & Maine commuter service on its own account without MBTA reimbursement of the $3,072,763 operating loss, the passenger service deficit would have been $3,606,081, requiring 62.46 percent of net railway operating income from freight service to subsidize the passenger deficit. All of the figures in this paragraph are actual for

the first 11 months and estimated for December 1965.

"There is a funded debt of $85,569,-271 of which $49,837,706 is due in 1967 and $20,741,857 is due in 1970. Carrier hopes to refinance $65,343,804 of 6 percent bonds which are included in the 1967 and 1970 maturities. Assuming refinancing at the same rate of interest the total interest payments on the entire funded debt through 1977 will be $47,849,138.

"As of December 31, 1965, carrier's working capital position has improved somewhat as a result of the $5,093,795 in subsidies and payments received in 1963 and 1965. Current assets were $11,807,639 and current liabilities were $16,762,097, with a resulting deficit in working capital of $4,954,458. Inclusion of $4,939,177 of long-term debt due within 1 year would result in a working capital deficit of $9,893,635 as compared with a deficit similarly computed of $13,940,101 as of March 31, 1964, and $13,763,816 as of December 31, 1964.

"Comparison of the balance sheets of December 31, 1963, which includes the subsidy, and December 31, 1965, which includes MBTA payments, shows that carrier's cash position has deteriorated further from 14.7 percent of current liabilities for 1963 to 14 percent for 1965 with cash and temporary cash investments of $2,349,006 and current liabilities of $16,762,097, as of December 31, 1965.

"As was noted in the prior case, it is obvious that Boston & Maine has been living on depreciation and the proceeds from the sale of its assets."

There cannot be much dispute that any deficit in these operations is a burden on interstate commerce. Indeed, the state's witness Bixler admitted that if Boston and Maine's figures as to avoidable costs are correct, "this would constitute something of a burden" on in-

terstate commerce in view of Boston and Maine's financial condition.

The existence of rail passenger service is a convenience, particularly in periods of bad weather, and is undoubtedly an advantage to existing educational institutions drawing students from outside the area particularly on this line, Dartmouth College and Norwich University, to the existing industry, commercial, manufacturing and recreational, and to the promotion of future development in these and other fields.

If the Commission's findings are correct, however, it is a convenience availed of by the public only to a limited extent, and if it is provided at a substantial loss by a carrier in serious financial straits, a finding that it is required by public convenience and necessity and will not unduly burden interstate commerce would not be supportable if made. Here the Commission has declined to make either of the two interrelated findings, either or both of which would be required to satisfy the statute. We find no error in this determination.

The state attacks primarily the findings on savable costs, although it also cuts somewhat deeper with the argument that even if the figures are valid they should not bear any weight in the absence of a good faith effort on the part of the carrier during the period covered by the figures to increase patronage and decrease costs, and it points to a claimed inconsistency with an earlier decision requiring the New Haven to continue three of these four trains in service, as well as to merger possibilities not given sufficient weight.

The state has a difficult task in seeking to upset findings on properly allocable costs by the Commission, a body expected to have some expertise on the subject. Cf. Chesapeake & Ohio Ry. Co. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824 (1931); United States v. Detroit & Cleveland Nav. Co.,

326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945). Our function is limited to determining whether the order has support in the law and in the record. United States v. Pierce Auto Lines, 327 U.S. 515, 536, 66 S.Ct. 687, 90 L.Ed. 821. (1946) We think the record as a whole supports the Commission's finding as to financial loss. In order to have any chance of affecting the result on the record here, it would be necessary to find that two major areas of actually incurred costs, for six locomotives assigned to this service and for shared costs of passenger stations at Springfield and Brattleboro, should not have been considered because measures could have been taken to avoid them. One hypothesis was that Boston and Maine could purchase one new motive power unit and by a pooling arrangement with the other roads, who would furnish a similar engine, run it straight through from New Haven or Springfield to Montreal, rescheduling the trains so that two engines would make the turnarounds fast enough to power all four trains, or alternatively that Boston and Maine purchase two new engines for its part of the run. This, however, has several weaknesses, the need for new capital outlay by a distressed carrier, doubt as to the feasibility of so fast a turnaround, need for agreement of others, lack of reserve power for breakdown or overhaul, doubt as to sufficient steam capacity for heat in severe weather. The carrier's contention that the six units in use are all needed, to be charged full time to this service may be somewhat questionable, but they were, after all, still in service, and there was testimony as to their necessity and the costs which would be avoided if all six should be sold (including $240,000 in rebuilding costs in the next two years, in addition to the savable costs found, if they should be retained). Indeed, the Commission noted that an expert for the state conceded that the present arrangement might be a convenient and sensible management decision.

The joint station costs again are costs actually incurred. Their avoidance would entail repudiation of the Springfield Station joint use contract under its 90-day cancellation clause (which carrier's counsel advised could not be done so long as the passenger trains were continued in operation), and building of an "austerity" station, which would again require a capital outlay of doubtful wisdom in view of the declining traffic. Abandonment of the Brattleboro station, if the Vermont Board approved, would save some $21,000, but probably further cut down the small traffic using that stop.

The Commission was not impressed with the showing as to probable increase in use during the great Montreal Exposition, Expo 67, starting April 28, 1967, and emphasized that it could be at best of only very temporary assistance.

It conceded that the road had been plagued with faulty (indeed we can take notice that it was sometimes corrupt) management, but found no basis for determining that better management could today reverse the situation as to these four trains.

It explained the apparent inconsistency with the New Haven decision by pointing out the difference in nature of the two roads, one almost entirely a freight carrier in financial straits but still operating its own line, the other, although also distressed and operating under a receivership, one of the largest passenger carriers which had not met the train-off standards of the statute, whereas Boston and Maine had clearly qualified by its proof here. It pointed out also that the New Haven trains serve hundreds of commuters on its lines, while the same trains serve very few people on the Boston and Maine segment.

That merger possibilities do exist and that a road shorn of money losing services is a more attractive merger candidate may be conceded. The time, nature and conditions of any such possibilities are, however, so uncertain that the Commission acting under the present terms of 13a would hardly be justified in giving them any substantial weight.

It is probably impossible to determine whether a loss on passenger traffic on a train is a burden on interstate commerce which is "undue" without weighing the detriment to public convenience from the proposed discontinuance. Conversely, public convenience and necessity of a particular service can hardly be assessed without consideration of the possibility that its continuance at a loss may endanger the other services rendered the public by the railroad, here freight service essential to the industry of the region, as the record shows.

█ The cast of the statute is toward relief of the individual carrier whose maintenance of uneconomic services threatens its ability to survive and continue to furnish its most essential services. State of New Hampshire v. Boston and Maine Corp., supra. On the facts here, with this road in shaky financial condition, a decision under the statute to allow it to discontinue a little used service operated at a loss does not call for reversal by the courts.

This is not to say that the result is the best which could have been devised were the Commission's powers broadened, but that it appears the only one open under the present national transportation policy or what passes for one.

Chairman Tucker's dissent in this case deplores the steady deterioration of intercity rail passenger service which is here carried forward. He was not impressed with Boston and Maine's showing on savable costs, regretted the failure to make more timely efforts to obtain state cooperation to save the service and called for more consideration of the possible effect of Expo 67. The difficulty, however, is not so much with the Commission's application of the statutory scheme here, but with the lack of timely government effort to preserve this resource which will be so badly needed soon after it is lost. We face the para-

dox that the completion of the interstate highway system with public financing will be the final blow to many interstate trains while the enormous cost in land taking, construction cost, air pollution and traffic congestion on the highways, together with the crowding of the airways and multiplication of jetport needs, will soon require a return to some form of mass rail passenger transport, hopefully of higher speed and greater comfort than we have lately experienced. See Bard op. cit. supra, 34 Univ. of Chi. L.R. at 305.

Whether mergers, public ownership or operation, or subsidies, federal, state and local, or a combination are the answer, some action by the Congress seems necessary to any satisfactory solution for the near future. Power to require continuation of existing or restoration of lost services by a road strengthened by merger might well be specifically granted the Commission by the Congress. The Commission in this case, faced with a Hobson's choice, did what was required of it by the statute.

Since we have determined that the Commission's order should be upheld, there is no occasion to consider the evidence offered outside the record before the Commission, on the application for injunctive relief, evidence which in any case added nothing of substance to the showing before the Commission as to lack of requirement of service for public convenience and necessity, and indeed, reinforced the conclusion that the Delaware & Hudson-New York Central service is adequate for through passengers even if all expected Expo 67 traffic should develop.

The order of the Commission is affirmed. The application for injunctive relief is denied.

LEDDY, District Judge.

Unfortunately, the provisions of Title 49 U.S.C. Section 13a (1) pose a substantial question of jurisdiction of the court to entertain this appeal.[1] However, I concur in the result reached by a majority of the court.

1. See State of New Hampshire v. Boston and Maine Corp., 251 F.Supp. 421 (D. N.H.1965); State of Minnesota v. United States, 238 F.Supp. 107 (D.Minn.1965); State of New Jersey v. United States, 168 F.Supp. 324 (D.N.J.1958), aff'd per curiam, 359 U.S. 27, 79 S.Ct. 603, 3 L.Ed. 2d 625, reh. den. sub nom. County of Bergen v. United States, 359 U.S. 950, 79 S.Ct. 722, 3 L.Ed.2d 683 (1959); Sludden v. United States, 211 F.Supp. 150 (M. D.Pa.1962); Pennsylvania R. Co. v. Sharfsin, 369 F.2d 276 (3rd Cir. 1966); California Oregon Power Co. v. Federal Power Commission, 99 U.S.App.D.C. 263, 239 F.2d 426 (1956); 49 U.S.C. Sec. 13a (1) (1965).